UNION CARBIDE CORPORATION,
Appellant

v.

Daisy E. SYNATZSKE and Grace Annette Webb, Individually and as Representatives and Co–Executrixes of the Estate of Joseph Emmite, Sr., Joseph Emmite, Jr., Dorothy A. Day, Vera J. Gialmalva and James R. Emmite, Appellees.

No. 01–09–01141–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

June 28, 2012.

Sharla J. Frost, James H. Powers, Powers & Frost, L.L.P., Stephen G. Tipps, Baker Botts, L.L.P., Houston, TX, for Appellant.

Sean Higgins, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Troy D. Chandler, Williams Kherkher Hart Boundas, LLP, Richard P. Hogan Jr., Hogan & Hogan, L.L.P., Houston, TX, Audra Merritt Dean, Tori Smith Levine, Dallas, TX, for Appellees.

Panel consists of Justices JENNINGS and SHARP.

**TERRY JENNINGS, Justice.**

Appellant, Union Carbide Corporation ("Union Carbide"), has filed a motion for

rehearing and for en banc reconsideration of this Court's June 30, 2011 opinion.[2] A majority of the Court has voted to grant en banc consideration. We withdraw our opinion and judgment of June 30, 2011, and we substitute this opinion and judgment in their place.

In this interlocutory appeal,[3] Union Carbide challenges the multi-district litigation ("MDL") pretrial court's order denying its motion and renewed motion to dismiss[4] the claims made against it by appellees, Daisy E. Synatzske and Grace Annette Webb, individually and as representatives and co-executrixes of the estate of Joseph Emmite, Sr., Joseph Emmite, Jr., Dorothy A. Day, Vera J. Gialmalva, and James R. Emmite (collectively, the "Emmites"), for the wrongful death[5] of Joseph Emmite Sr. ("Joseph"). Joseph's death, the Emmites allege, was caused by his exposure to asbestos when he worked for Union Carbide at its Texas City facility. In five issues, Union Carbide contends that the MDL pretrial court erred in de-

nying its motion and renewed motion to dismiss the Emmites' asbestos-related injury claims on the grounds that the Emmites, without a motion or a showing of good cause, did not timely serve Union Carbide with a physician report, which is required to bring such claims pursuant to Chapter 90 of the Texas Civil Practice and Remedies Code,[6] and none of the physician reports that the Emmites served upon Union Carbide satisfy various requirements of Chapter 90, including the requirement that such a report "verify" that "pulmonary function testing" had been performed on Joseph and the physician making the report had interpreted the pulmonary function testing.[7] The Emmites contend that the requirement of such a verification of pulmonary function testing to pursue their asbestos-related injury claims under Chapter 90, which became effective after Joseph had been exposed to asbestos and died, violates the Texas Constitution's prohibition against

Jennings, Alcala, and Sharp. After submission, the Honorable Elsa Alcala left the Court to become a Judge on the Texas Court of Criminal Appeals. The case was, therefore, originally decided by the two remaining justices. *See* Tex.R.App. P. 41.1(b).

**3.** *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(11) (Vernon Supp.2011) (providing for interlocutory appeal of denial of defendant's motion to dismiss, made pursuant to section 90.007 of Texas Civil Practice and Remedies Code, of claimant's asbestos-related injury claims); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 90.007 (Vernon 2011).

**4.** *See id.* § 90.007.

**5.** *See id.* §§ 71.002, 71.021 (Vernon 2008).

**6.** *See id.* §§ 90.003, 90.006, 90.010 (Vernon 2011).

**2.** This case was originally submitted with oral argument to a panel consisting of Justices

**7.** *See id.* §§ 90.003(a)(2)(D), 90.010(f)(1)(B)(ii).

retroactive laws.[8]

We affirm the order of the MDL pretrial court.

## I. Background

In their original petition, filed on June 7, 2007, the Emmites allege that Joseph, while employed by Union Carbide from 1940 to 1975, was exposed to asbestos and, as a result of this exposure, he contracted asbestosis and died on June 15, 2005. The Emmites attached to their original petition a physician report authored by Dr. R. Kradin.[9]

Union Carbide moved to dismiss the Emmites' claims, asserting that they had failed to serve it with an adequate physician report.[10] In response, the Emmites served upon Union Carbide a second physician report, dated August 9, 2007, authored by Dr. J.D. Britton. On September 14, 2007, during the MDL pretrial court's hearing on Union Carbide's motion, the Emmites asked the court to compel Union Carbide to produce from its personnel files Joseph's medical records. The Emmites sought to obtain the results of any pulmonary function testing that Union Carbide had performed on Joseph at the time that he had been employed by Union Carbide. At the end of the hearing, the court, stating that it considered this case to be "ex-

ceptional," orally denied Union Carbide's motion to dismiss "for good cause." The court instructed the Emmites to prepare an order denying Union Carbide's motion and setting forth its finding that their case involved an "exceptional circumstance." [11] After denying Union Carbide's motion to dismiss, the court did not address the Emmites' request to compel Union Carbide to produce Joseph's medical records.

On October 1, 2007, Union Carbide moved for reconsideration of the MDL pretrial court's oral ruling, and, at the beginning of the November 30, 2007 hearing on the motion, the court stated that it would not sign a written order denying Union Carbide's motion to dismiss. In fact, the court made it clear to the parties that it did not intend to sign an appealable interlocutory order.[12] After Union Carbide stated that this was "fine," the parties then discussed the Emmites' pending efforts to apply for an amended certificate of Joseph's death. The Emmites represented that Dr. S. McClure, on the day before the hearing, had signed an application for an amended death certificate that would support a finding that asbestosis was at least one cause of Joseph's death. Union Carbide complained that the affidavit that the Emmites proffered to substantiate this claim contained hearsay and it had not had the opportunity to depose McClure. Un-

---

8. See TEX. CONST. ART. I, § 16.

9. See id. § 90.003 (prescribing filing of physician report when claimant asserts asbestos-related injury claim).

10. See id. § 90.003(a)(2).

11. The MDL pretrial court's oral finding that it considered this to be an "exceptional case" that involved "exceptional circumstance[s]" indicates that it concluded that the Emmites' physician reports should be evaluated under section 90.010(f)(1), not section 90.003(a)(2) of the Texas Civil Practice and Remedies Code. Section 90.010(f)(1), as explained below, prescribes an alternative method to satis-

fy Chapter 90's physician report requirement "in exceptional and limited circumstances in which the exposed person does not satisfy the medical criteria of Section 90.003 ... but can demonstrate meaningful asbestos-related ... impairment...." See id. § 90.010(j).

12. The MDL pretrial court further remarked that if it eventually ruled against the Emmites and granted Union Carbide's motion to dismiss, then the Emmites would have the right to appeal. These remarks further signal the court's intention to not sign an appealable order at this point in the proceedings.

ion Carbide then placed in the record additional medical records for Joseph and his death certificate. The court stated that it would keep the record open for six weeks and, if the Emmites filed an amended death certificate showing that asbestosis was a cause of Joseph's death, the court would deny Union Carbide's motion.

On January 14, 2008, the Emmites served, for a second time, Union Carbide with the August 9, 2007 physician report of Dr. Britton, and indicated that, given the "extraordinary circumstances" of this case, they intended to rely upon it as their required physician report.[13] On January 18, 2008, the MDL pretrial court conducted a hearing, at which the Emmites expressed, consistent with their recent service of Britton's report upon Union Carbide, their intent to rely upon it as their required physician report. The Emmites explained that they were still trying to obtain a certified copy of Joseph's amended death certificate, and they requested "a full evidentiary hearing" to present witnesses and additional evidence.[14] The Emmites argued that their case presented an "extraordinary circumstance" because Union Carbide had produced to them Joseph's pulmonary function testing from when he had been a Union Carbide employee. The court granted the Emmites' request for a full evidentiary hearing, and it granted Union Carbide's request to depose Dr. McClure, who had signed Joseph's amended death certificate.

Although Union Carbide did not depose Dr. McClure until September 10, 2009, which was over one and one-half of a year after the MDL pretrial court's January 2008 hearing, a substantial portion of this delay was attributable to the fact that McClure had been seriously injured in an accident. And when Union Carbide did obtain McClure's deposition, she still suffered from some impairment due to her injuries. Shortly after obtaining McClure's deposition testimony, Union Carbide, on October 19, 2009, filed a "renewed" motion to dismiss the Emmites' claims.

In their November 5, 2009 response to the renewed motion to dismiss, the Emmites argued that Union Carbide had waived its right to seek dismissal because the parties had engaged in significant discovery and the motion was untimely filed. Moreover, the Emmites produced an October 28, 2009 physician report, authored by Dr. J. Prince, which they offered as an addendum to Prince's June 12, 2008 letter report that the Emmites had previously given to Union Carbide in the discovery process.

At its subsequent hearing on Union Carbide's renewed motion to dismiss, the MDL pretrial court instructed Union Carbide to file its written objections to Dr. Prince's report. The court explained that it wanted a complete record, including a copy of Prince's deposition, which had been obtained before the hearing. Pursuant to the court's instructions, Union Carbide filed its written objections to Prince's report. The Emmites then filed their response to Union Carbide's objections and Prince's December 2009 amended report, which had been prepared in an effort to respond to some of Union Carbide's written objections.

In his amended report, Dr. Prince, who had been Joseph's pulmonologist during a 2005 hospital visit, stated, in relevant part, that he had physically examined Joseph and provided him with a pulmonary consultation and treatment. Prince noted

13. *See id.* § 90.010(f)(1).

14. *See id.* § 90.010(g).

that Joseph was 85 years old at the time and had a medical history of benign prostatic hypertrophy, osteoarthritis, and dementia. Joseph, who also had a remote history of smoking cigars, had been brought to the emergency room "with a complaint of bilateral lower extremity edema as well as difficulty ambulating." Prince took an occupational exposure history from Joseph, who told Prince that he had worked as an insulator at Union Carbide for many years and "had a possible diagnosis of asbestosis." Prince also noted that Joseph's chest exam revealed "diminished breath sounds at the right lung base with associated dullness to percussion." Moreover, Joseph was "somewhat confused" and "unable to support his own weight while" standing or sitting. The hospital admitted Joseph with pneumonia, and Prince noted "the presence of bilateral calcified pleural plaques consistent with a prior exposure to asbestos." After conducting a computed tomography scan of Joseph's chest and administering other diagnostic tests, Prince diagnosed Joseph as suffering from "pulmonary asbestosis." [15] Prince further noted,

> In summary, premorbid diagnostic workup was compatible with benign asbestos pleural effusion. The findings of an exudative pleural effusion, coupled with the presence of the diagnostic imaging revealing pleural plaques and bilateral, predominantly basilar, pulmonary fibrosis support my clinical diagnosis of *pulmonary asbestosis with significant impairment.* More than sixty years had elapsed from [Joseph's] first asbestos exposure. Even in the absence of postmortem data overwhelmingly supporting the clinical findings, I was able to exclude other more

probable causes of the pulmonary findings identified in this patient's exposure, medical, and smoking history, and the postmortem data are merely confirmatory. *In an ideal clinical scenario, the treating physician would obtain pulmonary function testing to include lung volumes and diffusion. However, … this man was severely debilitated to the point he was unable to support his own weight…. I have been provided and interpreted the results of pulmonary function testing given to [Joseph] on prior occasions. It is my medical opinion that this patient simply could not have performed such testing when I examined him,* due to his advanced dementia limiting his ability to follow instructions, his overall severely debilitated state, and that shortness of breath would have made such testing difficult or even prohibitive, even if he were capable of following instructions.

As noted above, pulmonary function testing would be clinically ideal to secure the diagnosis of pulmonary asbestosis. It is my opinion that had the patient been able to successfully undergo pulmonary function testing, restriction and diffusion abnormalities would have been identified, consistent with his clinical diagnosis of pulmonary asbestosis. *However,* in [Joseph's] case, *the clinical history and other diagnostic testing, coupled with meticulous postmortem analysis of pulmonary tissue, confirm [] my opinion that [Joseph] had significant, advanced pulmonary asbestosis.* In making my diagnosis I have considered [Joseph's] other medical conditions—including immobility and

---

**15.** In a post-submission letter, Union Carbide highlights one of Joseph's medical records, which reveals that, on May 6, 2005, Joseph saw his primary care physician regarding a "chief complaint of a cough" and Joseph presented with a "history" of numerous conditions and ailments, including "occupational lung disease (asbestosis)."

pneumonia—and *it is my opinion that he had a pulmonary impairment from his asbestosis that was not more probably the result of other causes.*

(Emphasis added.)

On December 4, 2009, the MDL pretrial court granted Union Carbide's motion for reconsideration and conducted its final hearing, but the court did not rule on Union Carbide's renewed motion to dismiss. Rather, on December 22, 2009, the court, after considering all of the evidence, signed its order denying Union Carbide's motion to dismiss the Emmites' claims. In its order, the court made the following findings of fact:

1. Joseph Emmite worked as an insulator for approximately 39 years at the Union Carbide Texas City facility;

2. The autopsy findings revealed asbestosis that had resulted in severe pulmonary fibrosis and the cause of death was the combined effects of retained asbestos fibers;

3. Texas Civil Practice and Remedies Code § 90.003 and 90.004 do not adequately assess Joseph Emmite's pulmonary impairment due to physical and mental limitations from which Mr. Emmite suffered;

4. Shortly before his death Mr. Emmite suffered from physical and mental limitations, which made it impossible for him to take a pulmonary function test;

5. Had Joseph Emmite been physically and mentally capable of performing a pulmonary function test, the results would have demonstrated pulmonary impairment greater than required under Texas Civil Practice and Remedies Code § 90.003;

6. Due to Joseph Emmite's physical and mental limitations, severe asbestosis, and death, the medical criteria set forth in Texas Civil Practice and Remedies Code § 90.003 do not adequately [assess] Mr. Emmite's physical impairment caused by exposure to asbestos;

7. Dr. Joseph Prince is a qualified, board-certified pulmonary specialist who served Mr. Emmite as his last treating physician;

8. In his report and testimony, Dr. Prince verified that pulmonary function testing had been previously performed on Mr. Emmite and that he interpreted the results;

9. Other than cross-examination of Dr. Prince at his deposition, Union Carbide offered no evidence, either by way of live expert testimony, depositions, or fact witnesses to contradict the findings of Dr. Joseph Prince, Mr. Emmite's treating physician;

10. Dr. Prince had no history of working as a litigation consultant. The testimony and opinions offered by Dr. Prince were at all times credible, reliable and uncontroverted;

11. Joseph Emmite's case presents unique and extraordinary physical and medical characteristics justifying denial of Union Carbide's Motion to dismiss;

12. Mr. Emmite's family produced sufficient credible evidence to allow a finder of fact to reasonably find that Mr. Emmite's asbestos impairment is comparable to the impairment that an exposed person would have had if the exposed person met the criteria set forth in Section 90.003.

## II. Asbestos–Related Injury Claims

On September 1, 2005, approximately eleven weeks after Joseph's death, Chapter 90 of the Texas Civil Practice and Remedies Code, which sets forth new pro-

cedures and requirements for claims involving asbestos- and silica-related injuries, became effective. TEX. CIV. PRAC. & REM.CODE ANN. §§ 90.001–012 (Vernon 2011). The Texas Legislature, recognizing a growing "asbestos litigation crisis," which was proving to be "costly to employers, employees, litigants, and the court system,"[16] enacted Chapter 90 to protect "the right of people with impairing asbestos-related . . . injuries to pursue their claims for compensation in a fair and efficient manner through the Texas court system, while at the same time preventing scarce judicial and litigant resources from being misdirected by the claims of individuals who have been exposed to asbestos . . . but have no functional or physical impairment from asbestos-related . . . disease." *Id.* § 90.001 cmts. d, f, g, n. To fulfill these purposes, the legislature, through Chapter 90,

(1) adopt[ed] medically accepted standards for differentiating between individuals with nonmalignant asbestos-related . . . disease causing functional impairment and individuals with no functional impairment;

(2) provid[ed] a method to obtain the dismissal of lawsuits in which the exposed person has no functional impairment, while at the same time protecting a person's right to bring suit on discov-

ering an impairing asbestos-related . . . injury; and

(3) create[d] an extended period before limitations begin to run in which to bring claims for injuries caused by the inhalation or ingestion of asbestos . . . to preserve the right of those who have been exposed to asbestos . . . but are not yet impaired to bring a claim later in the event that they develop an impairing asbestos-related . . . injury.

*Id.* § 90.001 cmt. n.

## A. Section 90.003's Physician Report Requirements

A claimant asserting an asbestos-related injury[17] must serve on each defendant "a report by a physician who is board certified in pulmonary medicine, internal medicine, or occupational medicine" that "verifies that the physician or a medical professional employed by and under the direct supervision and control of the physician":

(i) performed a physical examination of the exposed person, or if the exposed person is deceased, reviewed available records relating to the exposed person's medical condition;

(ii) took a detailed occupational and exposure history [[18]] from the exposed person or, if the exposed person is

---

**16.** The Texas Legislature found that claims brought "by persons who are not functionally or physically impaired by any asbestos-related illness" had "severely hamper[ed] the ability of seriously ill claimants to seek redress in the courts." TEX. CIV. PRAC. & REM.CODE ANN. § 90.001 cmt. h (Vernon 2011).

**17.** The requirements for a physician report in a claim involving malignant mesothelioma or another malignant asbestos-related cancer are significantly different. *See id.* § 90.003(a)(1). In those cases, a claimant must file a physician report that states that the exposed person has been diagnosed with malignant mesothelioma or another malignant asbestos-related cancer and, to a reasonable degree of medical

probability, exposure to asbestos was a cause of the diagnosed mesothelioma or other cancer in the exposed person. *Id.*

Here, Joseph was not diagnosed with malignant mesothelioma or another malignant asbestos-related cancer. Rather, Joseph's alleged asbestos-related injury was asbestosis, and, in order to satisfy the Chapter 90 physician report requirements, the Emmites were required to file a report compliant with either section 90.003(a)(2) or section 90.010(f)(1) of the Texas Civil Practice and Remedies Code.

**18.** The "detailed occupational and exposure history" must describe (1) "the exposed person's principal employments and state wheth-

deceased, from a person knowledgeable about the alleged exposure or exposures that form the basis of the action; and

(iii) took a detailed medical and smoking history that includes a thorough review of the exposed person's past and present medical problems and their most probable cause[.]

*Id.* § 90.003(a)(2)(A). The report must set "out the details of the exposed person's occupational, exposure, medical, and smoking history" and verify that "at least 10 years have elapsed between the exposed person's first exposure to asbestos and the date of diagnosis[.]" *Id.* § 90.003(a)(2)(B).

Important to the issues presented in this case, the report, in addition to providing other detailed information, must "verif[y] that the exposed person has asbestos-related *pulmonary impairment as demonstrated by pulmonary function testing*" showing:

(i) forced vital capacity below the lower limit of normal or below 80 percent of predicted and FEV1/FVC ratio (using actual values) at or above the lower limit of normal or at or above 65 percent; or

(ii) total lung capacity, by plethysmography or timed gas dilution, below the lower limit of normal or below 80 percent of predicted[.]

*Id.* § 90.003(a)(2)(D) (emphasis added).

The report must also verify that the physician "has concluded that the exposed person's medical findings and impairment were not more probably the result of causes other than asbestos exposure revealed by the exposed person's occupational, exposure, medical, and smoking history[.]" *Id.* § 90.003(a)(2)(E). Moreover, the report must be accompanied by copies of, among other items, all "pulmonary function tests, including printouts of all data, flow volume loops, and other information demonstrating compliance with the equipment, quality, interpretation, and reporting standards set out" in Chapter 90.[19] *Id.* § 90.003(a)(2)(F). The claimant must serve upon each defendant the physician report prescribed by section 90.003 "not later than the 30th day after the date that defendant answers or otherwise enters an appearance in the action."[20] *Id.* § 90.006(a).

A defendant may file a motion to dismiss a claimant's asbestos-related injury claims

---

er the exposed person was exposed to airborne contaminants, including asbestos fibers and other dusts that can cause pulmonary impairment"; and (2) "the nature, duration, and frequency of the exposed person's exposure to airborne contaminants, including asbestos fibers and other dusts that can cause pulmonary impairment." *Id.* § 90.003(b). Other provisions of section 90.003, which are not relevant to this appeal, provide additional ways to satisfy section 90.003 if the claimant's pulmonary function test results or radiologic findings do not meet the above-stated requirements. *Id.* § 90.003(c), (d).

19. The comments to section 90.001 further evidence the Texas Legislature's intent in enacting such detailed requirements for a physician report in claims not involving malignant mesothelioma or another malignant asbestos-

related cancer. As explained by the legislature, "the asbestos litigation crisis" was "due, in part, to screening of persons with possible occupational exposure to asbestos," which identified individuals as suffering from asbestos-related disease "regardless of whether the individuals have any physical impairment." *Id.* § 90.001 cmt. f. The legislature noted that such individuals "file lawsuits, in part to avoid the running of limitations triggered by the discovery that they may have an asbestos-related injury," and the legislature further noted that "[m]any of the identified individuals," possibly as many as "90 percent," were not experiencing any symptoms from asbestos-related disease "affecting their daily functions." *Id.*

20. As discussed below, section 90.006 prescribes different deadlines for serving a physi-

if the claimant has not timely served a physician report on the defendant or the report does not comply with the requirements of section 90.003. *Id.* § 90.007(a). The motion must be filed on or before the 30th day after the date the report is served on the defendant, and, if the basis of the motion is that the report does not comply with section 90.003, "the motion must include the reasons why the report does not comply with that section." *Id.* The claimant may file a response to a motion to dismiss on or before the 15th day after the date the motion to dismiss is served. *Id.* § 90.007(b). A report required by section 90.003 may be filed, amended, or supplemented within the time required for responding to a motion to dismiss. *Id.* If a court is of the opinion that the motion to dismiss is meritorious, it must, except as provided by section 90.010(d) or (e), "by written order, grant the motion and dismiss all of the claimant's asbestos-related claims." *Id.* § 90.007(c). Any such dismissal is "without prejudice to the claimant's right, if any, to assert claims for an asbestos-related injury ... in a subsequent action." *Id.* On the filing of a motion to dismiss, "all further proceedings in the action are stayed until the motion is heard and determined by the court." *Id.* § 90.007(d). And, on the motion of a party showing good cause, the court may shorten or extend the time limits provided for filing or serving motions, responses, or reports. *Id.* § 90.007(e).

**B. Physician Report Requirements in "Exceptional and Limited Circumstances"**

Chapter 90 does provide alternative reporting requirements, which "apply only in exceptional and limited circumstances in which an exposed person does not satisfy the medical criteria of Section 90.003 ... but can demonstrate meaningful asbestos-related ... physical impairment...." *Id.* § 90.010(j). If a claimant "does not serve on a defendant a [physician] report that complies with section 90.003," an MDL pretrial court "shall, on motion of the defendant, dismiss the action under section 90.007, *unless,*"

(1) the claimant serves a report that complies with [section 90.010](f)(1) and

(2) the court, on motion and hearing, makes the findings required by section [90.010](f)(2).

*Id.* §§ 90.007(e), 90.010(e) (emphasis added). A claimant seeking a remand for trial on the denial of a motion to dismiss under section 90.010(e) must serve on each defendant a report that:

(A) complies with the requirements of Sections 90.003(a)(2)(A), (B), (E), and (F) and 90.003(b) ...; and

(B) verifies that:

(i) the physician making the report has a physician-patient relationship with the exposed person;

(ii) *pulmonary function testing has been performed on the exposed person and the physician making the report has interpreted the pulmonary function testing;*

(iii) the physician making the report has concluded, to a reasonable degree of medical probability, that the

cian report depending on whether the action was filed on or after the effective date of Chapter 90 or was already pending on the effective date of Chapter 90. Here, the Emmites filed their claims after the effective date of Chapter 90. We note that even if the

Emmites had filed their claims after Joseph's death in June 2005, but before Chapter 90's effective date in September 2005, they still likely would have had to serve Union Carbide with a physician report to maintain their claims. *Id.* § 90.006(b), (c).

exposed person has radiographic, pathologic, or computed tomography evidence establishing bilateral pleural disease or bilateral parenchymal disease caused by exposure to asbestos ...; *and*

(iv) the physician has concluded that the exposed person *has asbestos-related* ... *physical impairment comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003 or 90.004[.]*

*Id.* § 90.010(f)(1) (emphasis added). Moreover, the MDL pretrial court "shall determine" whether,

(A) the report and medical opinions offered by the claimant are reliable and credible;

(B) due to *unique or extraordinary physical or medical characteristics of the exposed person, the medical criteria set forth in Sections 90.003 and 90.004 do not adequately assess the exposed person's physical impairment* caused by exposure to asbestos ...; and

(C) the claimant has produced sufficient credible evidence for a finder of fact to reasonably find that the exposed person is physically impaired as the result of exposure to asbestos ... to a degree comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003....

*Id.* § 90.010(f)(2) (emphasis added). The MDL pretrial court must state its findings, made under section 90.010(f)(2), in writing and address in its findings:

(1) the unique or extraordinary physical or medical characteristics of the exposed person that justify the application of this section; and

(2) the reasons the criteria set forth in Sections 90.003 and 90.004 do not adequately assess the exposed person's physical impairment caused by exposure to asbestos....

*Id.* § 90.010(h). Again, we emphasize that subsections 90.010(e) and (f) "apply only in exceptional and limited circumstances in which the exposed person does not satisfy the medical criteria of Section 90.003 ... but can demonstrate meaningful asbestos-related ... physical impairment that satisfies the requirements of Subsection (f)." *Id.* § 90.010(j).

### III. Timeliness of Physician Reports

In its first issue, Union Carbide argues that the MDL pretrial court erred in denying its motion to dismiss the Emmites' asbestos-related injury claims because they failed to timely serve Union Carbide with a "complying [physician] report demonstrating a threshold level of asbestos-related impairment" and their "late filings were not supported by written or oral motions, nor by a showing of good cause." *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 90.003(a)(2), 90.006(a), 90.007.

Union Carbide specifically argues that the MDL pretrial court abused its discretion in relying upon any physician reports and evidence, other than Dr. Kradin's report and Dr. Britton's August 9, 2007 report, both of which the Emmites had timely served upon Union Carbide before the court's September 14, 2007 hearing, because the Emmites did not move for an extension of time, request an opportunity to offer additional evidence, or make a showing of good cause to support their untimely service of subsequent reports and evidence. Union Carbide asserts that the MDL pretrial court "lacked jurisdiction to deviate sua sponte over the last two and a half years from Chapter 90's specific timing requirements" and could not properly

consider the "untimely new evidence" and reports, including those of Dr. Prince, by relying upon subsections 90.010(e), (f), (g), and (j).

The Emmites timely filed, with their original petition, the physician report of Dr. Kradin,[21] and Union Carbide timely filed its motion to dismiss the Emmites' claims on the ground that the report did not comply with section 90.003(a)(2). The MDL pretrial court promptly held its September 14, 2007 hearing on Union Carbide's motion and orally denied it at the hearing. Despite Union Carbide's complaints that the Emmites did not move for an extension of time, request an opportunity to offer additional evidence, or make a showing of good cause to support their untimely reports and evidence, the Emmites, because they prevailed at the hearing, had no reason to make such a request or showing.[22]

The MDL pretrial court did not reduce its oral ruling to writing, and Union Carbide, in its briefing, concedes that it could have sought to obtain, at that time, a written order from the court denying its motion to dismiss; it elected instead to file a motion to reconsider. At the November 30, 2007 hearing on Union Carbide's motion to reconsider, the court made it clear that it was reconsidering whether the Emmites' claims should be dismissed. At the conclusion of the hearing, the court also made it clear that it was no longer willing to sign a written, appealable interlocutory order, despite its prior oral ruling. Because Union Carbide did not object or seek any other relief from the court's decision to not sign a written order, it foreclosed its right to bring an interlocutory appeal at that time. See TEX.R.APP. P. 26.1 (providing that notice of appeal in accelerated appeal must be filed within 20 days after order is signed).

■ Moreover, the Emmites, at the November 30, 2007 hearing on Union Carbide's motion for the MDL pretrial court to reconsider its oral denial of Union Carbide's motion to dismiss, told the court that they had recently submitted an application for an amended certificate of Joseph's death, which they believed would identify asbestosis as a cause of his death.[23] Implicit in the court's decision to "keep the record open for an additional six weeks" is that it considered the Emmites' oral statements as a request for additional time to introduce into the record supplemental evidence, which, the Emmites believed, would bear upon the court's ultimate decision as to whether to dismiss their claims. See TEX. CIV. PRAC. & REM. CODE ANN. § 90.007(e). A court has the discretion to, "[o]n the motion of a party

---

**21.** The Emmites concede on appeal that the physician reports of Dr. Kradin and Dr. Britton, both served upon Union Carbide prior to the MDL pretrial court's September 14, 2007 hearing, did not comply with the requirements of section 90.003(a)(2). However, they assert that their subsequently-filed physician reports of Dr. Prince, along with other evidence, comply with the requirements of section 90.010(f)(1).

**22.** We note that the Emmites, at the September 14, 2007 hearing, specifically requested that Union Carbide be compelled to produce its records regarding Joseph, including records related to any pulmonary function test-

ing that had been performed on him at Union Carbide in the 1960s and 1970s. After the MDL pretrial court orally denied Union Carbide's motion, the court did not rule upon the Emmites' discovery request.

**23.** On the same day of this hearing, the Emmites filed a motion to open discovery and to compel Union Carbide to produce Joseph's personnel and medical file. The Emmites specifically asserted that Union Carbide was in possession of missing evidence that Joseph had had pulmonary function testing performed on him that would enable the Emmites to satisfy the requirements of Chapter 90.

showing good cause," "extend the time limits ... for filing or serving motions, responses, or reports." *Id.* Here, the record indicates that the court construed the oral statements made by the Emmites at the hearing as a motion for an extension of time, and the record supports the court's implied finding that good cause supported such an extension. *See id.* Accordingly, we hold that the MDL pretrial court acted within its discretion under section 90.007(e) in allowing the Emmites additional time to supplement their response or their reports. *See id.*

At the subsequent January 18, 2008 hearing, the Emmites stated their intention, consistent with their January 14, 2008 second service upon Union Carbide of Dr. Britton's report, to comply with the physician report requirements of section 90.010(f)(1), and not section 90.003(a)(2), under which they had been previously proceeding. The Emmites explained that they were doing so, in part, because they had received from Union Carbide evidence of pulmonary function testing that had been performed on Joseph during his employment at Union Carbide. Implicit in the Emmites' statements to the MDL pretrial court is the assertion that the testing evidence was relevant and necessary for them to comply with section 90.010(f)(1)(B)(ii) and a request to allow them to rely upon it at a time when the court was still considering Union Carbide's motion to reconsider its original motion to dismiss. There is nothing in section 90.010, or in Chapter 90, that precluded the Emmites from invoking section 90.010(f)(1) after they had previously sought to comply with section 90.003(a)(2).

In regard to Union Carbide's complaint that the MDL pretrial court abused its discretion in not granting its motion to dismiss under Chapter 90's "strict" deadlines, an MDL pretrial court must, on a motion by a defendant under section 90.007, dismiss an action unless the claimant serves a physician report upon the defendant that complies with section 90.010(f)(1) and the court, on motion and hearing, makes the findings required by section 90.010(f)(2). *Id.* § 90.010(e). However, section 90.010 does not contain a deadline for a claimant to file a physician report that complies with section 90.010(f)(1). And, as discussed below, section 90.010 mandates a discovery period and evidentiary hearing. *See id.* § 90.010(g). Moreover, although section 90.006, entitled "Serving Reports," provides that a report prescribed by section 90.003 must be served no later than the 30th day after a defendant answers or appears in an action, it contains no reference to a deadline for service of a report under section 90.010(f)(1). *Id.* § 90.006.

We further note that a court has the discretion to "extend the time limits ... for filing or serving motions, responses, or reports." *See id.* § 90.007(e). And section 90.007 specifically provides that a court shall grant a motion to dismiss a claimant's asbestos-related claims for failure to timely serve a report that does not comply with section 90.003, *"[e]xcept as provided by"* section 90.010. *See id.* § 90.007(c) (emphasis added). Here, the Emmites invoked section 90.010(f)(1) at a time when the MDL pretrial court was still entertaining Union Carbide's motion to dismiss the Emmites' claims. Although section 90.010(e) refers to motions to dismiss under section 90.007, section 90.010 contains several provisions that authorize an MDL pretrial court to handle cases in which section 90.010(f)(1) is invoked much differently than cases in which a claimant offers a physician report under section 90.003(a).

When a claimant asserting an asbestos-related injury claim seeks to satisfy Chapter 90 by serving a physician report pursu-

ant to section 90.010(f)(1), the procedures for handling a motion to dismiss are necessarily different from those established regarding a physician report served pursuant to section 90.003(a). First, although section 90.010(e) provides that an MDL pretrial court must dismiss a claimant's asbestos-related injury claim for failure to serve a compliant report, the court, if subsection (f) is invoked, must conduct an evidentiary hearing "at which the *claimant* and any defendant to the action may offer supporting or controverting evidence." *Id.* § 90.010(g) (emphasis added). Second, the court must provide the parties with a reasonable discovery period before the evidentiary hearing. *Id.* Thus, section 90.010 expressly contemplates that, once a party invokes subsection (f), that party will be entitled to obtain additional discovery and introduce additional evidence supporting its claims.[24]

In sum, section 90.010 necessarily contemplates that a physician report may be supplemented with additional physician reports or evidence offered by a claimant in order to render an original report compliant with Chapter 90. Here, once the Emmites invoked section 90.010(f) and re-

quested a full evidentiary hearing (at a time when the trial court was considering Union Carbide's pending motion to reconsider its motion to dismiss), the parties were entitled to engage in discovery for a reasonable period of time. *Id.* § 90.010(g). During this period, Union Carbide took the deposition of Dr. McClure and thereafter filed its renewed motion to dismiss. In response, the Emmites, prior to the evidentiary hearing, supplemented the record with two additional physician reports by Dr. Prince, Joseph's treating pulmonologist. Union Carbide filed written objections to Prince's reports and, during the discovery period, also deposed Prince. We hold that the MDL pretrial court did not abuse its discretion in considering the motion, responses, and reports, including those of Dr. Britton and Dr. Prince, and all other evidence presented at and discussed during the evidentiary hearing in determining whether the Emmites' physician reports satisfied the requirements of section 90.010(f)(1). *See id.* Accordingly, we further hold that the MDL pretrial court did not err in denying Union Carbide's motion and renewed motion to dismiss on

---

**24.** We do not suggest that discovery or evidentiary hearings would not be available under any circumstances under section 90.003, but we note that section 90.010(g) expressly authorizes such procedures. However, we also note that section 90.007(d) provides for a stay in proceedings "[o]n the filing of a motion to dismiss under this section" until the motion "is heard and determined." *See id.* § 90.007(d). Union Carbide's argument that section 90.007's "strict" deadlines should be applied even in the context of a party invoking section 90.010(f) ignores the inherent conflict between the stay provision in section 90.007(d) and the discovery period authorized under section 90.010(g).

Union Carbide also suggests that the legislature, in drafting section 90.006, which provides that a report prescribed by section 90.003 must be served no later than 30 days after the defendant answers or appears in the action, inadvertently failed to reference section 90.010. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 90.006(a). Union Carbide asks us to "apply equally" section 90.006's deadlines to section 90.010. But, again, as noted above, Union Carbide agrees that section 90.006 does not reference section 90.010, and section 90.007(e) allows a court, upon motion showing good cause, the discretion to "extend the time limits ... for filing or serving motions, responses, or reports." *See id.* § 90.007(e). Simply put, although Union Carbide complains that the result reached in this case "undermines the legislature's intent" to "weed out claims by or on behalf of the unimpaired early in the litigation," the trial court, in the specific circumstances here, did not act in violation of the procedures expressly authorized by Chapter 90, as it is currently drafted.

the ground that the Emmites, without a motion or a showing of good cause, did not timely serve Union Carbide with a physician report.

We overrule Union Carbide's first issue.

## IV. Adequacy of Required Physician Reports

In its second, third, fourth, and fifth issues, Union Carbide argues that the MDL pretrial court erred in denying its motion and renewed motion to dismiss the Emmites' asbestos-related injury claims because none of the Emmites' physician reports comply with the requirements of Chapter 90.

■ Before we address these issues, we note that the Emmites argue that Union Carbide has waived any error in regard to the MDL pretrial court's denial of its motion and renewed motion to dismiss the Emmites' claims on the ground that their physician reports do not comply with the requirements of Chapter 90 because Union Carbide participated in discovery during the period between the court's January 18, 2008 hearing and the filing of the renewed motion to dismiss in October 2009. *See id.* § 90.007(d) (providing for stay of all proceedings until motion to dismiss under section 90.007 is heard and determined). The Emmites assert that Union Carbide cannot appeal the trial court's September 14, 2007 oral ruling and, even if it could, Union Carbide's appeal is untimely.

In regard to the Emmites' untimely-appeal argument, Union Carbide agrees that it is not bringing an interlocutory appeal of the MDL pretrial court's September 14, 2007 oral ruling. Although Union Carbide argues that we should limit our consideration of the court's December 2009 order to the two original reports of Drs. Kradin and Britton, which were served on Union Carbide by the Emmites prior to the first hearing in September

2007, this argument fails because (1) Union Carbide filed a motion to reconsider, (2) Chapter 90 provided the court with discretion in extending deadlines to file motions, responses, and reports, (3) the Emmites invoked section 90.010(f) at a time when the court was still entertaining Union Carbide's motion to dismiss and motion for reconsideration, (4) nothing in Chapter 90 precluded the Emmites from seeking to satisfy Chapter 90 through section 90.010(f), and (5) section 90.010(g) contemplates a discovery period and an evidentiary hearing at which the parties are offered the opportunity to supplement the record with additional evidence.

In regard to the Emmites' waiver argument, the record contains an explanation for the delay in Dr. McClure's deposition and the associated delay for Union Carbide's filing of its renewed motion to dismiss. Although it is undisputed that Union Carbide participated in some discovery during the period between the filing of its original motion to dismiss and its renewed motion to dismiss, it had a right to do so under section 90.010(g) and the record otherwise demonstrates that Union Carbide did not waive any error in regard to the MDL pretrial court's ruling on its renewed motion to dismiss.

### A. Section 90.003(a)(2) Physician Reports

In its second issue, Union Carbide argues that the physician reports by Dr. Kradin and Dr. Britton do not comply with section 90.003(a)(2) because they do not include, among other requirements, a detailed occupational and exposure history and a detailed medical and smoking history. *See id.* §§ 90.003(a)(2)(A)(ii)-(iii), 90.003(b). Union Carbide also asserts that these reports do not include a verification that Joseph had an asbestos-related impairment as demonstrated by pulmonary

function testing and a verification that the doctors had concluded that Joseph's impairment was not more probably the result of causes other than asbestos exposure. *See id.* § 90.003(a)(2)(D), (E).

The Emmites concede that Dr. Kradin's report and Dr. Britton's report, which they originally served on Union Carbide in order to comply with section 90.003(a)(2), do not comply with the requirements of that section.

We sustain Union Carbide's second issue.

### B. Section 90.010(f)(1) Physician Reports

■ In its third, fourth, and fifth issues, Union Carbide argues that the physician reports of Dr. Prince[25] do not comply with section 90.010(f)(1), which itself requires compliance with several subsections of section 90.003, because Prince did not conduct a thorough review of Joseph's past and present medical problems, he did not "set out the details of [Joseph's] medical history," and his reports do not otherwise comply with pertinent subsections of section 90.003. *See id.* §§ 90.003(a)(2)(A), (B), (E), (F); 90.003(b); 90.010(f)(1)(A). Union Carbide asserts that the "primary problem" with Prince's reports is that they make reference to "40 year old pulmonary function test results reflecting no impairment" and he "did not rely" on these reports "in reaching his conclusions about impairment." *See id.* § 90.003(f)(1)(B)(ii). Union Carbide notes that although the legislature, by providing the alternative physician report requirements of section 90.010(f)(1), relaxed a number of the physician report requirements of section

90.003(a), pulmonary function testing must still constitute a part of a treating physician's determination of impairment. *See id.*

Union Carbide specifically argues that Dr. Prince's first report does not comply with several pertinent subsections of section 90.003 and 90.010 because Prince failed to conduct "a thorough review" of Joseph's "past and present medical problems"; set out the details of Joseph's medical history; review Joseph's other medical records from Joseph's 2004 and 2005 hospital admissions or any other medical records; detail Joseph's "long history of serious medical conditions"; refer to Joseph's pneumonia diagnosis—"the very condition for which he was admitted to the hospital" and that "eventually caused his death"; give "sufficient weight" to Joseph's "other medical infirmities"; verify that he concluded that Joseph's impairment was "not more probably the result of causes other than asbestos exposure"; exclude other causes of "medical findings and impairment"; or "exclude the most probable cause of any pulmonary impairment," i.e., his pneumonia. *See id.* §§ 90.003(a)(2)(A), (B), (E), (F); 90.003(b); 90.010(f)(1). Union Carbide asserts that even if Prince's first report was not "facially deficient," his "wholesale failure" to review Joseph's medical records and to analyze the impact of other medical conditions renders "his opinions less than reliable and credible."

Union Carbide acknowledges that Dr. Prince's second report "facially remedied some of [its] objections" to Prince's first report, but Union Carbide asserts that "the boilerplate fashion" in which this report remedied those objections "renders

---

**25.** Within its third, fourth, and fifth issues, Union Carbide also asserts that Dr. Britton's report, which the Emmites served for a second time upon Union Carbide in their effort to comply with section 90.010(f)(1), does not

comply with that section. The Emmites do not challenge this assertion, but they contend that the reports authored by Dr. Prince satisfy the requirements of section 90.010(f)(1).

its credibility suspect." Union Carbide asserts that the second report is "still deficient despite [Prince's] professing to have looked" at additional medical records because he did not consider other "earlier records" and his "new report still contained no detailing of [Joseph's] medical history and probable causes of medical diagnosis."

Our review of Dr. Prince's second report reveals that he served as Joseph's treating physician in 2005, approximately one month before Joseph's death. In his second report, Prince discussed Joseph's medical and smoking history, a number of medical conditions from which Joseph had suffered, and Joseph's occupational exposure history. Prince identified all of the medical records that he reviewed; stated that he reviewed Joseph's "detailed occupational exposure history," which had been provided by one of Joseph's "fellow insulator/asbestos [ ] coworkers who was knowledgeable about his workplace exposure to asbestos and other substances"; stated that he was attaching these materials to his report; and explained that all of his opinions included "consideration of [Joseph's] past and final medical problems and their most probable causes." Prince described Joseph's occupational exposure history, stated that he personally performed a physical examination of Joseph in May 2005 when he was hospitalized, stated that he provided "pulmonary consultation" and "rendered treatment," and confirmed that he "developed a physician-patient relationship with [Joseph] as one of his treating physicians." Prince diagnosed Joseph with "pulmonary asbestosis with significant impairment."

Dr. Prince further noted that he was "able to exclude other more probable causes of the pulmonary findings identified" in Joseph's exposure, medical, and smoking history. Prince opined, based upon "the clinical history and other diagnostic testing, coupled with meticulous postmortem analysis of pulmonary tissue," that Joseph had "significant, advanced pulmonary asbestosis." Prince noted that, in making this diagnosis, he considered Joseph's other medical conditions, including pneumonia, and he confirmed his opinion that Joseph suffered from pulmonary impairment "from his asbestosis that was not more probably the result of other causes." Even if Prince's second report could have included more detail about Joseph's medical and occupational history, we cannot say that the MDL pretrial court abused its discretion in overruling the objections of Union Carbide that were not based on the pulmonary function testing requirement of section 90.010(f)(1)(B)(ii).

■ In addressing what Union Carbide describes as "the primary problem" with Dr. Prince's second report, i.e., his use of "40-year old pulmonary function test results reflecting no impairment" upon which he "did not rely" "in reaching his conclusions about [Joseph's] impairment," we understand that, in his report, Prince concluded that Joseph had suffered from "pulmonary asbestosis with significant impairment." Prince "was able to exclude other more probable causes of the pulmonary findings identified" in Joseph's exposure, medical, and smoking history. And Prince maintained that, even without the pulmonary function testing, Joseph's "clinical history and other diagnostic testing, coupled with meticulous postmortem analysis of pulmonary tissue," confirmed his diagnosis. Nevertheless, Prince himself agreed that, "[i]n an ideal clinical scenario," he would have liked to have performed pulmonary function testing on Joseph. He noted, however, that, on the date that he saw Joseph, such testing would have been "difficult or even prohibitive."

As noted above, the Texas Legislature has expressly provided that a claimant seeking to satisfy Chapter 90's physician report requirements under section 90.010 must serve on each defendant a report that verifies, among other things, that the physician making the report has a physician-patient relationship with the exposed person and that "pulmonary function testing has been performed on the exposed person and the physician making the report has interpreted the pulmonary function testing." *See id.* § 90.010(f)(1)(B)(i)-(ii).

The Emmites agree, and Dr. Prince's reports reveal, that Prince did not perform pulmonary function testing on Joseph, nor did anyone else during the time period in which the Emmites allege that Joseph suffered from an asbestos-related impairment. The only evidence in the record that pulmonary function testing had been performed on Joseph related to testing performed by Union Carbide in the 1960s and 1970s, approximately forty years before Joseph's death. It is undisputed that this testing revealed no impairment at the time it was administered, and neither Prince nor the Emmites rely upon this testing as proof that Joseph suffered from an asbestos-related impairment during his lifetime or that he died as a result of his asbestos exposure. Prince conceded in his deposition that he did not use pulmonary function testing to support his diagnosis; rather, he agreed that he could not rely upon such testing in making his diagnosis because, at the time he treated Joseph, Joseph could not participate in pulmonary function testing.

We cannot accept the Emmites' argument that Dr. Prince's reports comply with section 90.010(f)(1)(B)(ii) merely because they reference the results of the Union Carbide pulmonary function testing and Prince reviewed the results. As conceded by the Emmites, the Union Carbide pulmonary function testing was not relevant to Prince's diagnosis of Joseph. Thus, under their argument, the Emmites would be able to pursue their asbestos-related injury claims only as a result of the fortuity of the fact that Union Carbide had pulmonary function testing, the results of which were irrelevant to Prince's diagnosis, performed on Joseph in the 1960s or 1970s.

Allowing asbestos-related injury claimants to pursue their claims by satisfying the physician report requirements of Chapter 90 with an employer's or another party's pulmonary function testing, performed on an exposed person many years prior to any alleged asbestos-related impairment, and the results of which are irrelevant to a diagnosis of impairment, would result in the arbitrary treatment of claimants. The Texas Legislature, through Chapter 90, has elected to require those claiming non-cancerous asbestos-related injuries to substantiate the injuries with required physician reports, which themselves require pulmonary function testing. Section 90.010(f)(1)(B)(ii) plainly requires a treating physician to verify the performance of pulmonary function testing on an exposed person and interpret the testing. Although it, unlike section 90.003(a)(2)(D), does not require a showing of any specific minimal impairment, we conclude that the only reasonable interpretation of section 90.010(f)(1)(B)(ii) is that such testing must be considered by the physician in making his diagnosis. Therefore, the pulmonary function testing must be relevant to any diagnosis of impairment.

Our conclusion is supported by the Texas Legislature's expressly stated reasons for enacting Chapter 90 and the plain language of section 90.010(f)(1)(B) when read in its entirety and in context with section 90.003(a)(2)(D). The legislature enacted

Chapter 90 in large part to "provide [ ] a method to obtain the dismissal of lawsuits in which the exposed person has no functional impairment," while protecting the legal rights of exposed persons with manifested asbestos-related functional impairment. *Id.* § 90.001 cmt. n. In doing so, it "adopt[ed] medically accepted standards for differentiating between individuals with nonmalignant asbestos-related ... disease causing functional impairment and individuals with no functional impairment." *Id.* Critical to fulfilling these medical standards is pulmonary function testing. In section 90.003(a)(2)(D), the legislature requires "verif[ication] of [certain specific minimal] pulmonary impairment as demonstrated by pulmonary function testing." Although section 90.010(f)(1)(B) does not require a showing of any specific minimal impairment, it also requires that pulmonary function testing be performed on an exposed person and the testing be interpreted by the person's physician. And the physician interpreting any pulmonary function testing must be board certified in "pulmonary medicine, internal medicine, or occupational medicine." *Id.* § 90.002(2). Moreover, subsection (ii) of 90.010(f)(1)(B), which addresses the requirement of pulmonary function testing in extraordinary cases, should not be read in isolation, but must be read in the context of each of the requirements of section 90.010(f)(1)(B) joined together, especially subsection (iv), which requires that the physician conclude

that "the exposed person has asbestos-related ... physical impairment comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003...." Although, as Union Carbide candidly concedes, pulmonary function testing during Joseph's "last few months of life was likely unobtainable," Dr. Prince's reports simply cannot satisfy the requirements of section 90.010(f)(1)(B) without pulmonary function testing relevant to his diagnosis of impairment.[26]

Accordingly, we hold that the pulmonary function testing performed on Joseph by Union Carbide approximately forty years before Joseph's death, and which was irrelevant to Dr. Prince's diagnosis of impairment, cannot be used to satisfy the pulmonary function testing requirement of section 90.010(f)(1)(B)(ii). We further hold that the MDL pretrial court erred in concluding that Prince's reports satisfied the requirements of section 90.010(f)(1)(B)(ii). We sustain the portions of Union Carbide's third, fourth, and fifth issues in which it contends that the Emmite's physician reports do not satisfy the requirements of section 90.010(f)(1)(B)(ii).

## V. Constitutionality of Section 90.010(f)(1)(B)(ii)

The Emmites argue that if Dr. Prince's reports do not satisfy the requirements of

---

**26.** We note that portions of section 90.003 specifically contemplate that a claimant may bring a wrongful death action related to a deceased person's exposure to asbestos and resulting asbestos-related injury. *See id.* § 90.003(a)(2)(A)(i), (ii) (stating that claimant must file report that verifies that physician or medical professional "performed a physical examination of the exposed person, *or if the exposed person is deceased,* reviewed available records relating to the exposed person's medical condition" and "took a detailed occupational and exposure history from the exposed

person *or, if the exposed person is deceased,* from a person knowledgeable about the alleged exposure or exposures that form the basis of the action"). Section 90.010(f) includes these requirements. *See id.* § 90.010(f)(1)(A) (stating that claimant must serve a report that, among other things, "complies with the requirements of Sections 90.003(a)(2)(A)"). Yet, section 90.010(f) also includes the requirement of pulmonary function testing, and it makes no distinction for exposed persons who are deceased and those who are not. *See id.* § 90.010(f)(1)(B)(ii).

section 90.010(f)(1)(B)(ii) on the ground that they lack a verification that pulmonary function testing had been performed on Joseph and the physician making the report has interpreted the testing, section 90.010(f)(1)(B)(ii), as applied to them, violates the Texas Constitution's prohibition against retroactive laws. *See* TEX. CONST. art. I, § 16. The Emmites assert that when Joseph died, "his family's rights became vested against those who caused his injury and, at that time," a pulmonary function test was "not required to bring an asbestos claim." The Emmites argue that "[i]f a law enacted after [Joseph] could no longer take a breathing test retroactively requires such a test, it is unconstitutional."

Prior to submission, Union Carbide argued that because the Emmites "had not secured a final judgment" on the effective date of Chapter 90, they had no vested right to pursue their claims without satisfying the pulmonary function testing requirement of section 90.010(f)(1)(B)(ii). Union Carbide also argued that, even if the requirements of section 90.010(f)(1)(B)(ii) affected the Emmites' vested rights, the Texas Legislature acted constitutionally and properly in exercising its "police power in balancing the legitimate expectations" of claimants against the need to control the "crush of asbestos litigation." Union Carbide asserted that the Emmites' "claim of a vested right is even more dubious because their cause of action is based on a statute—the Texas Wrongful Death Act." *See id.* §§ 71.002, 71.021 (Vernon 2008) (providing for statutory wrongful death and survival claims).

Union Carbide, in its post-submission briefing and rehearing motion, notes that the Texas Supreme Court has recently and "fundamentally changed the landscape of constitutional retroactivity analysis in this state." *See Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 137 (Tex.2010).

Union Carbide asserts that the supreme court, in *Robinson*, disposed of the "much maligned and ultimately unfathomable 'vested rights analysis,'" and, under its new test, section 90.010(f)(1)(B)(ii), as applied to the Emmites' claims, passes constitutional muster. As part of its argument, Union Carbide notes that the Emmites' claims are based on a statute—the Texas Wrongful Death Act—and as such the retroactivity analysis involves different considerations. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 71.002, 71.021.

The Texas Constitution, in our Bill of Rights, provides, in no uncertain terms, that

> *No* bill of attainder, ex post facto law, *retroactive law*, or any law impairing the obligation of contracts, *shall be made.*

TEX. CONST. art. I, § 16 (emphasis added). The Bill of Rights further provides that

> To guard against transgressions of the high powers herein delegated, we declare that everything in the "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions are void.

*Id.* art. I, § 29.

We begin our analysis with the presumption that a statute is constitutional, and a party challenging its constitutionality bears the burden of demonstrating that it fails to pass constitutional muster. *See Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 934 (Tex.1996). However, when the legislature has done that which our Bill of Rights forbids, it is the duty of the judiciary to declare such enactments null and void. *See, e.g., Bronson v. Kinzie*, 42 U.S. 311, 1 How. 311, 11 L.Ed. 143 (1843). Thus, we must examine the express words of the constitution to determine if a valid reason exists to defeat the presumption of a statute's validity.

*Cox v. Robison,* 105 Tex. 426, 430, 150 S.W. 1149, 1151 (1912). In interpreting the Texas Constitution, Texas courts must rely heavily on the literal text and must give effect to its plain language.[27] *Republican Party of Tex. v. Dietz,* 940 S.W.2d 86, 89 (Tex.1997). If any provision of a statute is held to be invalid, the invalidity does not affect other provisions that can properly be given effect in the absence of the invalid provisions. *Quick v. City of Austin,* 7 S.W.3d 109, 115 (Tex.1998); *see also* TEX. GOV'T CODE ANN. § 311.032(c) (Vernon 2005).

▬▬▬▬ A retroactive law is "a law that acts on things which are past." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 219 (Tex.2002) (citing *DeCordova v. City of Galveston,* 4 Tex. 470, 475 (Tex.1849)). As noted by the United States Supreme Court, the "principle that the legal effect of *conduct* should ordinarily be assessed under the law that existed *when the conduct took place* has timeless and universal human appeal." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) (emphasis added). The Texas Supreme Court, in comparing the constitutional prohibition against retroactive laws in the civil-law context to the constitutional prohibition against ex post facto laws in the criminal-law context, has noted that "the plain and obvious meaning and intention" of prohibiting ex post fact laws is that legislatures "shall not pass laws, *after a fact done* by a subject, or a citizen, *which shall have relation to such fact,* and shall punish him for having done it." *Robinson,* 335 S.W.3d at 137 (quoting *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1. L.Ed. 648 (1798)) (emphasis added). Thus, as explained by the supreme court, the prohibition against retroactive laws has "two fundamental" objectives: (1) it protects "settled expectations," which "'should not be lightly disrupted,'" i.e., "the rules should not change after the game has been played," and (2) it protects against "abuses of legislative power," which "'offer[s] special opportunities for the powerful to obtain special and improper legislative benefits.'" *Id.* at 139 (quoting *Landgraf,* 511 U.S. at 265–267, 267 n. 20, 114 S.Ct. at 1497–98, 1498 n. 20). Given these two fundamental principles recognized by the supreme court, an unconstitutional retroactive law is, in regard to tort liability, essentially a law that either creates or relieves such liability for conduct that took place before the effective date of the law. As the Texas Constitution clearly forbids the legislature from criminalizing certain past conduct by enacting ex post facto laws, it also clearly forbids the legislature from either creating or relieving tort liability for certain past conduct by enacting retroactive laws.[28]

---

**27.** Justice Frost of our sister court has noted that "[t]he people of the State of Texas, in emphatic and compelling language set forth in section 29 of the Texas Bill of Rights, have expressly withheld from the Legislature the authority to enact retroactive laws in violation of section 16 of the Texas Bill of Rights." *Robinson v. Crown Cork & Seal Co.,* 251 S.W.3d 520, 541 (Tex.App.-Houston [14th Dist.] 2006) (Frost, J., dissenting), *rev'd,* 335 S.W.3d 126 (Tex.2010).

**28.** Thus, whether a statutory provision is unconstitutionally retroactive, in regard to tort liability, necessarily requires a court to consider whether the provision has the effect of either establishing or eliminating such liability for conduct that occurred before the enactment of the statute. Such a statutory provision, "that acts on things which are past," certainly disrupts "settled expectations" and "changes the rules" in regard to tort liability "after the game has been played." *See Robinson v. Crown Cork & Seal Co., Inc.,* 335 S.W.3d 126, 139–40 (Tex.2010). It is precisely this type of retroactive law that article I, section 16 of the Texas Constitution absolutely forbids.

In *Robinson*, Barbara Robinson and her husband, John, filed suit against Crown Cork & Seal ("Crown"), alleging that John had contracted mesothelioma from workplace exposure to asbestos products, including products that were manufactured by a corporation with which Crown had merged. *Id.* at 129. The Robinsons further alleged that Crown had succeeded to this merged corporation's liabilities. *Id.* During the pendency of the Robinsons' suit, the Texas Legislature enacted Chapter 149 of the Texas Civil Practice and Remedies Code, "which limit[ed] certain corporations' successor liability for asbestos claims." *Id.* at 130 (citing TEX. CIV. PRAC. & REM.CODE ANN. § 149.001–.006 (Vernon 2011)). Crown subsequently sought summary judgment, arguing that Chapter 149 barred the Robinsons' claims. *Id.* at 132–33. In response, the Robinsons argued that the record did not support the application of Chapter 149 or, alternatively, Chapter 149 violated article I, section 16 of the Texas Constitution. *Id.* at 133. After the trial court granted Crown's summary-judgment motion, John Robinson died. *Id.*

On appeal, Barbara Robinson asserted that Chapter 149 was a retroactive law, prohibited by article I, section 16 of the Texas Constitution, and the legislature had no authority to extinguish her accrued cause of action against Crown. *Id.* The supreme court, after providing extensive analysis of Texas' vested-rights jurisprudence, explained,

> We think our cases establish that the constitutional prohibition against retroactive laws does not insulate every vested right from impairment, nor does it give way to every reasonable exercise of the Legislature's police power; *it protects settled expectations that rules are to govern the play and not simply the score, and prevents the abuses of legislative power that arise when individuals or groups are singled out for special reward or punishment.*

*Id.* at 145 (emphasis added). It then articulated a new test for determining whether a statute violates the prohibition against retroactive laws in article I, section 16 of the Texas Constitution, stating,

> [C]ourts must consider three factors in light of the prohibition's dual objectives: the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; the nature of the prior right im-

---

Texas courts have struggled with articulating a standard for determining whether a statute is unconstitutionally retroactive, focusing on whether a challenged statute "impairs vested rights." *See id.* Texas courts have traditionally held that a statute violates the Texas Constitution's prohibition against retroactive laws if, when applied, the statute "takes away or impairs vested rights acquired under existing law." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002) (citing *Ex parte Abell*, 613 S.W.2d 255, 260 (Tex.1981)); *City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex.1997). This test can be directly traced to Justice Story's famous statement:

> [E]very statute, which takes away or impairs vested rights acquired under existing

laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective....

*Soc'y for the Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) (No. 13,156) (quoted in *Robinson*, 335 S.W.3d at 140). However, applying such a broad standard, which, it seems, was intended to cover most, if not all, civil-law matters, has proven to be highly problematic. *See Robinson*, 335 S.W.3d at 139–47. As noted by the Texas Supreme Court, "What constitutes an impairment of vested rights is too much in the eye of the beholder to serve as a test for unconstitutional retroactivity." *Id.* at 143.

paired by the statute; and the extent of the impairment.

*Id.* The court emphasized,

> The perceived public advantage of a retroactive law is not simply to be balanced against its relatively small impact on private interests, or the prohibition would be deprived of most of its force. There must be a compelling public interest to overcome the heavy presumption against retroactive laws. To be sure, courts must be mindful that statutes are not to be set aside lightly. This Court has invalidated statutes as prohibitively retroactive in only three cases, all involving extensions of statutes of limitations. But *courts must also be careful to enforce the constitutional prohibition to safeguard its objectives.*

*Id.* at 145–46 (citations omitted) (emphasis added). It noted that "changes in the law that merely affect remedies or procedure, or that otherwise have little impact on prior rights, are usually not unconstitutionally retroactive." *Id.* at 146.

In considering the nature of the Robinsons' rights and Chapter 149's impact on those rights, the supreme court recognized that Chapter 149 did not "directly restrict the Robinsons' common law action for personal injuries due to exposure to asbestos in the workplace" but rather "supplant[ed] the usual choice-of-law rules" by mandating that Texas courts apply the Texas law limiting successor liability "even if . . . successor liability arose under the law of another state." *Id.* at 147. However, the court noted that Chapter 149 extinguished the Robinsons' claims and all other such claims against Crown in Texas and "extinction was the Legislature's specific intent." *Id.* at 148. It also noted that "[a]n interest in maintaining an established common-law cause of action is greater than an interest in choice-of-law rules." *Id.* The court further noted that although "[a]n unliquidated claim may have little or no value, as for example when the cause of action has not been recognized or the elements of recovery cannot be proved," the Robinsons' claims constituted "a mature tort," and the court characterized the Robinsons' recovery as "more predictable." *Id.* The court emphasized that the injury at issue was "mesothelioma," and that such an injury was a "uniquely asbestos-related disease." *Id.* It also considered the discovery on file that reflected that the "claims had a substantial basis in fact." *Id.* Because the "the Robinsons could well have expected . . . that a rule of law that permitted their recovery . . . would not be changed after they had filed suit to abrogate their claim," and because Chapter 149 disturbed "settled expectations," the court concluded that Chapter 149 "significantly impact[ed] a substantial interest the Robinsons [had] in a well-recognized common-law cause of action." *Id.* at 148–49.

Next, in considering the public interest served by Chapter 149, the supreme court stated that the "legislative record [was] fairly clear that Chapter 149 was enacted to help only Crown and no one else," but yet "the record" supporting the legislation "was silent concerning the number" of asbestos-related claims pending against Crown "or the amount of Crown's probable exposure." *Id.* at 149. The court rejected Crown's argument that Chapter 149 helped "alleviate the asbestos litigation crisis that has already bankrupted many companies, resulting in lost jobs and a burden on the State's economy" because "[t]he Legislature made no findings to justify Chapter 149." *Id.* It stated that, contrary to Crown's argument, the legislature had not acknowledged the asbestos litigation crisis in enacting Chapter 149. *Id.* In contrast, the court noted that the legislature had expressly recognized the asbestos litigation crisis in enacting Chapter 90, the

provision at issue here. *Id.* at 149, n. 130. And it pointed out that even the principal sponsor of Chapter 149 had "fail [ed] to show how the legislation serve[d] a substantial public interest," and the record was unclear as to how the public interest benefitted as a result of Chapter 149. *Id.* at 149. Thus, the court concluded that the "public interest served by Chapter 149[was] slight." *Id.* at 150.

Having concluded that Chapter 149 significantly impacted the Robinsons' substantial interest in a well-recognized common-law cause of action and the public interest served by Chapter 149 was slight, the supreme court held that Chapter 149, as applied to the Robinsons' common-law claims, violated article I, section 16 of the Texas Constitution. *Id.*

■ In the instant case, an application of the Texas Supreme Court's newly articulated test for determining whether a statute is unconstitutionally retroactive compels our conclusion that section 90.010(f)(1)(B)(ii)'s requirement of a verification that Joseph had had pulmonary function testing performed on him in order for the Emmites to assert their asbestos-related injury claims is unconstitutional as applied to them. We conduct our analysis in light of the "two fundamental" objectives of our constitution's prohibition against retroactive laws: (1) the protection of "settled expectations," which " 'should not be lightly disrupted,' " i.e., "the rules should not change after the game has been played," and (2) the protection against "abuses of legislative power," which " 'offer[s] special opportunities for the powerful to obtain special and improp-

er legislative benefits.' " *Id.* at 139 (quoting *Landgraf,* 511 U.S. at 265–67, 267 n. 20, 114 S.Ct. at 1497–98, 1498 n. 20). Mindful of these objectives, we consider (1) the nature and strength of the public interest served by section 90.010(f)(1)(B)(ii) as evidenced by the legislature's factual findings; (2) the nature of the Emmites' prior rights impaired by section 90.010(f)(1)(B)(ii); and (3) the extent of the impairment of those rights. *Id.* at 145.

## A. The Nature of the Rights Claimed by the Emmites and Section 90.010(f)(1)(B)(ii)'s Impact on Those Rights

As did the Texas Supreme Court in *Robinson,* we first consider together the nature of the rights claimed by the Emmites and section 90.010(f)(1)(B)(ii)'s impact on them. *See id.* at 147–48. With the passage of Chapter 90, the Texas Legislature imposed physician reporting requirements on all asbestos-related injury claims filed on or after its effective date as well as on all such claims pending on the effective date and in which a trial, or any new trial or retrial following motion, appeal, or otherwise, commenced 90 days after Chapter 90's effective date. TEX. CIV. PRAC. & REM.CODE ANN. § 90.006(a), (c). Chapter 90 became effective on September 1, 2005, after Joseph's death but well over one year before the Emmites had filed suit. Thus, as noted above, the Emmites, in order to assert and maintain their claims, were required to serve a physician report in compliance with section 90.010(f)(1)(B)(ii).[29] TEX. CIV. PRAC. & REM. CODE ANN. § 90.010(e).

---

**29.** The Texas Legislature excepted from the physician reporting requirements any asbestos-related injury claims in any pending actions in which the trial had commenced on or before 90 days after Chapter 90's effective date. TEX. CIV. PRAC. & REM.CODE ANN.

§ 90.006(b). Section 90.006 prescribed different deadlines for filing the required physician report depending on whether the action was filed on or after, or was pending on, the effective date of Chapter 90. *See id.* § 90.006. Here, the Emmites' cause of action accrued

Union Carbide does not dispute the fact that during the last months of his life, pulmonary function testing could not be performed on Joseph and he died before Chapter 90 became effective. Specifically, Union Carbide, in its briefing, "does not dispute that [Joseph] had a diagnosis of asbestosis; ... and that, given his advanced dementia" and other conditions "pulmonary function testing during [Joseph's] last few months of life was likely unobtainable." Moreover, it is undisputed that at the time Joseph died, a physician report containing a pulmonary function test was not required to bring asbestos-related injury claims like those asserted by the Emmites.

Because a pulmonary function test could not be performed on Joseph, section 90.010(f)(1)(B)(ii)'s requirement of a verification that Joseph had pulmonary function testing performed on him, like Chapter 149 in *Robinson*, would have the effect of extinguishing the Emmites' claims. *See Robinson*, 335 S.W.3d at 148. Also, like the Robinsons' claims, the Emmites' claims, although unliquidated, had become a mature tort, and their recovery was, as concluded by the MDL pretrial court, more predictable. *See id.* And, as in *Robinson*, the evidence on file reveals that the Emmites' claims have a substantial basis in fact.[30] *See id.* Indeed, the MDL pretrial court specifically found:

2. The autopsy findings revealed asbestosis that had resulted in severe pulmonary fibrosis and the cause of [Joseph's] death was the combined

effects of retained asbestos fibers; . . . .

5. Had Joseph Emmite been physically and mentally capable of performing a pulmonary function test, the results would have demonstrated pulmonary impairment greater than required under Texas Civil Practice and Remedies Code § 90.003; . . . .

10. Dr. Prince had no history of working as a litigation consultant. The testimony and opinions offered by Dr. Prince were at all times credible, reliable and uncontroverted; . . . [and]

12. Mr. Emmite's family produced sufficient credible evidence to allow a finder of fact to reasonably find that Mr. Emmite's asbestos impairment is comparable to the impairment that an exposed person would have had if the exposed person met the criteria set forth in Section 90.003[.]

Moreover, in his second report, Dr. Prince specifically noted:

In summary, premorbid diagnostic workup was compatible with benign asbestos pleural effusion. The findings of an exudative pleural effusion, coupled with the presence of the diagnostic imaging revealing pleural plaques and bilateral, predominantly basilar, pulmonary fibrosis *support my clinical diagnosis of pulmonary asbestosis with significant impairment.*

---

before the effective date of Chapter 90, but because the Emmites did not file their cause of action until 2007, it was not pending on the effective date of Chapter 90. Nevertheless, section 90.006 makes clear that, even if the Emmites had filed their claim immediately after Joseph's death in June 2005, but before the effective date of Chapter 90 in September 2005, the Emmites would still likely have

been required to file a complying physician report under Chapter 90. *See id.*

30. Union Carbide asserts that the Emmites' "reliance on [Joseph's] death as conclusive proof of his impairment is misplaced." It also asserts that Joseph's autopsy and amended death certificate do not establish his impairment.

(Emphasis added.) In regard to pulmonary function testing, Prince emphasized:

> As noted above, pulmonary function testing would be clinically ideal to secure the diagnosis of pulmonary asbestosis. *It is my opinion that had the patient been able to successfully undergo pulmonary function testing, restriction and diffusion abnormalities would have been identified, consistent with his clinical diagnosis of pulmonary asbestosis. However, in [Joseph's] case, the clinical history and other diagnostic testing, coupled with meticulous postmortem analysis of pulmonary tissue, confirms my opinion that [Joseph] had significant, advanced pulmonary asbestosis.* In making my diagnosis I have considered Mr. Emmite's other medical conditions—including immobility and pneumonia—and it is my opinion that he had a pulmonary impairment from his asbestosis that was not more probably the result of other causes.

(Emphasis added.) Thus, according to Dr. Prince, given the strength of the Emmites' case, although pulmonary function testing would have been "ideal," it would have, based on the strength of "meticulous postmortem analysis" and other diagnostic testing, merely served to confirm the obvious.

As noted above, Union Carbide argues that the Emmites' constitutional challenge is even weaker because their cause of action is based on a statute—the Texas Wrongful Death Act, and "the settled expectations in a statutory cause of action differ from those in a common-law claim." *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 71.002, 71.021; *see also Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 903 (Tex.2000) (recognizing that wrongful death and survival claims are statutory). In support of its argument, Union Carbide

cites *Quick v. City of Austin,* in which the Texas Supreme Court explained,

> The general rule is that when a statute is repealed without a savings clause limiting the effect of the repeal, the repeal of that statute is usually given immediate effect. When a right or remedy is dependent on a statute, the unqualified repeal of that statute operates to deprive the party of all such rights that have not become vested or reduced to final judgment. Ordinarily, all suits filed in reliance on the statute must cease when the repeal becomes effective; if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal. *The repeal of the statute in such instances deprives a court of subject matter jurisdiction over the cause.*

7 S.W.3d 109, 128 (Tex.1998) (citations omitted) (emphasis added). Similarly, in *Dickson v. Navarro County Levee Improvement Dist. No. 3,* the court stated,

> It is almost universally recognized that if a statute giving a special remedy is repealed, without a saving clause in favor of pending suits, all suits must stop where the repeal finds them; and, if final relief has not been granted before the repeal goes into effect, it cannot be granted thereafter. A like general rule is that if a right to recover depends entirely upon a statute, *its repeal deprives the court of jurisdiction over the subject matter.*

135 Tex. 95, 99, 139 S.W.2d 257, 259 (1940) (emphasis added). Based upon this language, Union Carbide reasons that, if the legislature could have repealed the entire Wrongful Death Act and deprived the Emmites of any recovery, the "less sweeping modification of [the Emmites'] rights" under Chapter 90 would "necessarily" not deprive them of a vested right.

In *Robinson,* the Texas Supreme Court recognized that "an analysis of the retroactive effect" of a statute "on common law claims and statutory claims presents different considerations." *See Robinson,* 335 S.W.3d at 136. But, the court did not address this issue, stating, "We intimate no view on whether Chapter 149 limits Robinson's statutory wrongful death and survival claims except insofar as they are derivative of the claims specifically adjudicated by the trial court."[31] *Id.* at 136.

Unlike in *Quick* and *Dickson,* here, the legislature has not "unqualified[ly] repeal[ed]" the statutory basis for the Emmites' claims, and there is no suggestion that the MDL pretrial court was deprived of jurisdiction over their claims. Thus, the legal principles set forth in these opinions do not dictate a rejection of the Emmites' claims. Moreover, in regard to Union Carbide's assertions that Chapter 90 does not include a savings clause, we note that the Texas Government Code supplies a general savings clause. *See* TEX. GOV'T CODE ANN. § 311.031 (Vernon 2005); *see also Quick,* 7 S.W.3d at 129–30 (stating that legislature's adoption of general savings clause indicates general legislative policy that "repeal of any statute shall not affect the prior operation of that statute nor extinguish any liability incurred or affect any right accrued or claim arising before" repeal takes effect and that court will presume that general savings clause applies "unless a contrary legislative intent is shown by clear expression or necessary implication"). Thus, Union Carbide has not demonstrated that the Emmites are foreclosed from asserting their asbestos-related injury claims because their causes of action are based in statute rather than common law.

The bottom line is that the pulmonary function testing requirement of section 90.010(f)(1)(B)(ii) under the unique circumstances presented in this case would in fact extinguish the asbestos-related injury claims of the Emmites.[32] It would have a grave impact on the Emmites' well-established right to pursue their claims, which, like the Robinsons' claims, have a substantial basis in fact. *See Robinson,* 335 S.W.3d at 147–49. Thus, if applied here, section 90.010(f)(1)(B)(ii) would change the rules "after the game has been played" and "disturb settled expectations." *See id.*

## B. The Nature and Strength of the Public Interest Served by Section 90.010(f)(1)(B)(ii)

We next consider, as did the supreme court in *Robinson,* the nature and the strength of the public interest served by section 90.010(f)(1)(B)(ii). *See id.* at 149. The Texas Legislature enacted Chapter 90 specifically in response to an "asbestos

---

31. In its rehearing motion, Union Carbide asserts that the supreme court, in *Robinson,* "*explicitly* recognized that the settled expectations in a statutory cause of action differ from those in a common-law claim." (Emphasis added.) Actually, although the supreme court acknowledged that the analysis involves different considerations, the supreme court *explicitly* "intimate[d] no view" on the matter. *See Robinson,* 335 S.W.3d at 136. And, contrary to Union Carbide's arguments on rehearing, the *Robinson* opinion does not compel the failure of the Emmites' constitutional challenge because their claims are based on statute rather than common law.

32. Normally, a dismissal for failure to timely serve a physician report, or one that complies with the requirements of section 90.003, would be "without prejudice to the claimant's right, if any, to assert claims for an asbestos-related injury ... in a subsequent action." TEX. CIV. PRAC. & REM.CODE ANN. § 90.007. Here, however, given Joseph's death, a pulmonary function test cannot be performed on him; thus, the Emmites' claims would be extinguished.

litigation crisis," which it found to be "costly to employers, employees, litigants, and the court system." Tex. Civ. Prac. & Rem. Code Ann. § 90.001 cmts. d, f, g. In doing so, the legislature cited the facts that "hundreds of thousands of lawsuits alleging asbestos-related disease have been filed throughout the United States," "[i]n the period from 1988 to 2000, more lawsuits alleging asbestos-related disease were filed in Texas than in any other state," and "between 60,000 and 128,000 American workers" had "lost their jobs as a result of asbestos-related bankruptcies." *Id.* § 90.001 cmts. c, e, g.

However, the legislature emphasized that it was enacting Chapter 90 not only to protect companies that are commonly sued for asbestos-related injuries and their employees, but also for the express purpose of protecting "the right of people with impairing asbestos-related . . . injuries to pursue their claims for compensation in a fair and efficient manner through the Texas court system, while at the same time preventing scarce judicial and litigant resources from being misdirected by the claims of individuals who have been exposed to asbestos . . . *but have no functional or physical impairment from asbestos-related . . . disease.*" *Id.* § 90.001 cmt. n (emphasis added). The legislature specifically found that persons who were not "functionally or physically impaired by any asbestos-related illness" and who had brought asbestos-related lawsuits had "severely hamper[ed] the ability of seriously ill claimants to seek redress in the courts." *Id.* § 90.001 cmt. h. It explained that "[t]hose claimants who have had their day in court often find that the value of their recovery is seriously reduced when the company against whom the judgment was rendered files bankruptcy due to the weight of asbestos litigation brought by unimpaired claimants." *Id.*

Thus, in contrast to Chapter 149, the Texas Legislature made clear its legitimate intent in enacting Chapter 90 through extensive findings. Significantly, the supreme court in *Robinson* acknowledged the legislative findings made in support of Chapter 90 in contrasting it with Chapter 149. *See Robinson,* 335 S.W.3d at 149. It is quite clear that Chapter 90, in its entirety, serves a substantial public interest in protecting not only employers and employees, but also legitimate asbestos-related injury claimants.

Our analysis, however, does not end here. We have to look at the nature and the strength of the public interest served by section 90.010(f)(1)(B)(ii), the provision specifically challenged by the Emmites, in the context of their claims. Generally, the pulmonary function testing requirement of section 90.003(a)(2)(D) probably well fulfills the legitimate legislative purpose of "preventing scarce judicial and litigant resources from being misdirected" by those who have been exposed to asbestos but "have no functional or physical impairment" from asbestos-related disease. Tex. Civ. Prac. & Rem.Code Ann. § 90.001 cmt. n. However, section 90.010(f)(1)(B)(ii), unlike section 90.003(a)(2)(D), does not require that pulmonary function testing show any specific minimal impairment.

Given the circumstances presented in this case, requiring a pulmonary function test under section 90.010(f)(1)(B)(ii) would have the opposite effect of what the legislature actually intended, i.e., the protection of "the right of people with impairing asbestos-related" injuries "to pursue their claims for compensation in a fair and efficient manner." *Id.* § 90.001 cmt. n. As noted above, although pulmonary function testing of Joseph would have been "ideal," here, according to Dr. Prince, whom the MDL pretrial court found credible, such testing was not necessary to establish Jo-

seph's asbestos-related impairment. As emphasized by Dr. Prince, had Joseph "been able to successfully undergo pulmonary function testing, restriction and diffusion abnormalities would have been identified, consistent with his clinical diagnosis of pulmonary asbestosis.[33] However, in [Joseph's] case, the clinical history and other diagnostic testing, coupled with meticulous postmortem analysis of pulmonary tissue, confirms my opinion that [Joseph] had significant, advanced pulmonary asbestosis."

Thus, here, there is no compelling reason for the retroactive application of section 90.010(f)(1)(B)(ii) and no public interest is served by its application to the asbestos-related injury claims of the Emmites. Indeed, its application would only serve to shield Union Carbide from tort liability to claimants whom Chapter 90 was enacted, in large part, to protect. It would effectively give Union Carbide a "special opportunit[y] ... to obtain [a] special and improper legislative benefit[ ]."[34] *See Robinson*, 335 S.W.3d at 139.

Joseph died before Chapter 90 became effective, and it is undisputed that at the time he died, a physician report was not required to bring asbestos-related injury claims. Significantly, it is also undisputed that, during the last months of his life,

Joseph could not undergo pulmonary function testing for medical reasons. Based upon the unique circumstances presented in this case, we conclude that the application of section 90.010(f)(1)(B)(ii) to preclude the Emmites' from pursuing their claims would act on "things which are past," disrupt "settled expectations," and "change the rules" in regard to tort liability "after the game has been played." *See id.* at 139. Thus, section 90.010(f)(1)(B)(ii), as applied to the Emmites' asbestos-related injury claims, violates article I, section 16 of the Texas Constitution. *See Robinson*, 335 S.W.3d at 150. Accordingly, we conclude that the MDL pretrial court did not err in denying Union Carbide's motion and renewed motion to dismiss the asbestos-related injury claims of the Emmites.

## VI. Conclusion

We affirm the order of the MDL pretrial court denying Union Carbide's motion and renewed motion to dismiss the asbestos-related injury claims of the Emmites.

A majority of the justices of the Court voted in favor of reconsidering the case en banc. TEX. R. APP. P. 49.7.

The en banc court on reconsideration consists of Chief Justice RADACK and Justices JENNINGS, KEYES, HIGLEY, BLAND, SHARP, and BROWN.

---

**33.** Union Carbide, in its rehearing motion, asserts that Joseph "reasonably would have expected to have been given [a pulmonary function test] had his doctors believed he was impaired by his asbestosis," pulmonary function testing "is nothing new," and "[e]ven before Chapter 90's enactment, anyone suffering from asbestos-related pulmonary impairment would have undergone such testing." Union Carbide further asserts that Joseph, "within the contemplation of Chapter 90, was one of the unimpaired." Union Carbide's factual assertions, which are not established by the record, are contradicted by Dr. Prince's findings and ignore his opinion that Joseph, at the time he suffered impairment from as-

bestosis, could not have performed a pulmonary function test.

**34.** Again, as noted above, normally, a dismissal for failure to timely serve a physician report, or one that complies with the requirements of section 90.003, would be "without prejudice to the claimant's right, if any, to assert claims for an asbestos-related injury ... in a subsequent action." TEX. CIV. PRAC. & REM.CODE ANN. § 90.007. Here, however, given Joseph's death, because a pulmonary function test cannot be performed on him, the Emmites' claims would be extinguished.

Justice JENNINGS, writing for the En Banc Court, joined by Justices HIGLEY and SHARP.

Justice KEYES joins parts I, II, III, and IV of the En Banc Opinion.

Justice BLAND, concurring in the judgment, joined by Chief Justice RADACK and Justice BROWN.

Justice KEYES, dissenting from the judgment.

Justices MASSENGALE and HUDDLE not sitting.

JANE BLAND, Justice, concurring.

After reviewing a report and testimony from Joseph Emmite's lung doctor, the trial court allowed this lawsuit to proceed past the petition stage. *See* Tex. Civ. Prac. & Rem.Code Ann. § 90.010(e)-(f) (West 2011). Based on medical evidence of the kind the statute describes, the trial court found the treating physician's opinion that asbestos-related impairment existed reliable enough for a lawsuit to proceed. On this record, the MDL trial court did not abuse its discretion in reaching that conclusion. Because the record supports the trial court's finding that the proffered proof meets the requirements of section 90.010(f)(1), we concur in the judgment affirming the order of the MDL pretrial court.

### Discussion

Union Carbide seeks reversal of the trial court's ruling for two reasons. As a preliminary matter, Union Carbide contends that the trial court abused its discretion in considering a physician's report proffered well after the Emmites filed their lawsuit. In challenging the merit of the trial court's ruling, Union Carbide contends that this report does not satisfy the statutory criteria for evidence of impairment under section 90.010(f)(1), because the Emmites pro-

vided an out-of-date pulmonary function test to Emmite's pulmonologist, rather than recent testing, and the pulmonologist, Dr. Prince, did not rely on this outdated testing to conclude that Emmite had asbestos-related breathing impairment before his death.

### I. Timing of Expert Reports

#### a. The First Motion to Dismiss and Reports Proffered Pursuant to Section 90.003

When they filed their lawsuit, the Emmites filed an expert report pursuant to section 90.003—the statute that governs the required expert reports in most asbestos cases. *See* Tex. Civ. Prac. & Rem.Code Ann. § 90.003 (West 2011) (prescribing filing of expert report meeting statutory criteria when claimant asserts asbestos-impairment claim). Section 90.006 prescribes the time for filing an expert report under section 90.003: it must be served within thirty days of the defendant's answer. *See* Tex. Civ. Prac. & Rem.Code Ann. § 90.006(a) (West 2011).

The Emmites timely filed and served Dr. Kradin's report on Union Carbide. And they timely supplemented the Kradin report, with Dr. Britton's report, after Union Carbide moved to dismiss their claims. *See* Tex. Civ. Prac. & Rem.Code Ann. § 90.007(a) (West 2011) (permitting motion to dismiss in response to claimant's failure to timely serve report or failure to serve report that complies with section 90.003 or 90.004); *see also id.* § 90.007(b) ("A claimant may file a response to a motion to dismiss on or before the 15th day after the date the motion to dismiss is served. A report required by Section 90.003 or 90.004 may be filed, amended, or supplemented within the time required for responding to a motion to dismiss.").

The MDL court considered Union Carbide's motion to dismiss at a September 2007 hearing. The trial judge denied the motion on the record, but did not issue a written order. Union Carbide did not object to the court's failure to sign a written order, nor did it seek appellate relief from the trial court's ruling. In its briefing, Union Carbide acknowledges that it could have obtained a written order from the MDL judge or filed an interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(11) (West Supp.2011). Instead, Union Carbide requested that the trial court reconsider its ruling. Because it did not appeal the ruling denying its motion to dismiss within twenty days of the ruling, Union Carbide forewent its right to an interlocutory appeal of the denial of its motion to dismiss. *See* TEX.R.APP. P. 26.1(b).

In November 2007, the MDL court heard Union Carbide's motion to reconsider. The court declined to rule on the motion during the hearing. At the hearing, the Emmites—still proceeding under section 90.003—alerted the MDL court that they planned to produce an amended death certificate, listing asbestosis as a contributing cause of Emmite's death. According to the plurality, the MDL court impliedly considered this a motion to extend time under section 90.007(e) to introduce supplemental evidence into the record, and the MDL court did not abuse its discretion in granting a six-week extension to the Emmites. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.007(e) ("On the motion of a party showing good cause, the court may shorten or extend the time limits provided in this section for filing or serving motions, responses, or reports.").

We disagree with the plurality's analysis. In refusing to dismiss the case, the MDL court determined that Union Carbide's September 2007 motion to dismiss lacked merit. In doing so, the court impliedly concluded that the claimant's report complied with section 90.003. *See id.* § 90.007(c). Thus, the Emmites had no reason to seek an extension to cure their report or supplement it. But if the court had concluded that the report was deficient, the claimants could not have cured it at that point. The statute requiring dismissal is mandatory, not permissive; it provides that, "if the court is of the opinion that a motion to dismiss is meritorious, the court shall, by written order, grant the motion . . . ." *See id.* Although section 90.007(e) allows the trial court to "extend the time limits provided . . . for filing or serving motions, responses, or reports" for good cause shown, it does not permit claimants to cure a deficient report once the trial court has decided the matter. *See id.* § 90.007(e). Section 90.007 is unlike other statutes that grant time for a claimant to cure a report once a trial court has found it deficient. *Compare* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a), (c) (West 2011) (requiring expert report in suit against doctor for medical liability and granting trial court discretion to grant one thirty-day extension for failure to serve adequate report), *and* TEX. CIV. PRAC. & REM.CODE ANN. § 128.053(c) (West Supp. 2011) (requiring expert report in suit against sport-shooting range and granting trial court discretion to grant one thirty-day extension to cure deficient report), *with* TEX. CIV. PRAC. & REM.CODE ANN. § 90.007 (requiring expert report in suit for asbestos impairment but containing no provision for extension of time to cure deficient report), *and* TEX. CIV. PRAC. & REM.CODE ANN. § 150.002(a), (c) (West 2011) (requiring certificate of merit in suit against licensed professional but containing no provision for extension of time to cure deficient report), *and Sharp Eng'g v. Luis,* 321 S.W.3d 748, 754 n. 10 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (Sulli-

van, J., concurring) (noting lack of opportunity to cure deficient report filed under Chapter 150). Under section 90.007, a trial court has no authority to reopen the record after denying a motion to dismiss to permit claimants to cure a timely filed, but otherwise deficient report. Instead, the claimant must file a new lawsuit, attaching a complying report. *See* Tex. Civ. Prac. & Rem.Code Ann. § 90.007(c) ("A dismissal under this section is without prejudice to the claimant's right, if any, to assert claims for an asbestos-related injury or a silica-related injury in a subsequent action.").

Union Carbide's participation in the discovery process did not waive its appellate complaint. *See Pro Plus, Inc. v. Crosstex Energy Servs.*, 388 S.W.3d 689, 704 (Tex. App.-Houston [1st Dist.] 2012, pet. filed) (participating in litigation process and discovery did not waive right to seek motion to dismiss for failure to timely file certificate of merit in suit against licensed professional). Courts have held that participating in the litigation process or delaying pursuit of dismissal, without more, does not show intent to waive a right to dismissal. *See, e.g., Jernigan v. Langley*, 111 S.W.3d 153, 157–58 (Tex.2003) (doctor did not waive motion to dismiss even though he waited more than 600 days to file motion, participated in discovery, and moved for summary judgment); *Ustanik v. Nortex Found. Designs, Inc.*, 320 S.W.3d 409, 414 (Tex.App.-Waco 2010, pet. denied) (participating in discovery process does not, alone, constitute waiver); *DLB Architects, P.C. v. Weaver*, 305 S.W.3d 407, 411 (Tex.App.-Dallas 2010, pet. denied) (waiting more than one year to file dismissal motion did not manifest intent to waive). Participating in the litigation process by conducting discovery does not manifest a defendant's intent to waive a right to seek dismissal. *See Ustanik*, 320 S.W.3d at 414.

Dismissal of the suit against it is ultimately any defendant's goal.

**b. Consideration of Section 90.010 Reports and Evidence Introduced in Response to Union Carbide's Pending Motion to Reconsider**

Union Carbide's motion to reconsider remained pending before the trial court from October 2007 until December 2009. The parties did not press the trial court for a ruling on Union Carbide's motion to reconsider, and they continued to seek and offer evidence into the record. Significantly, during this time, the Emmites elected to proceed under section 90.010. As Chapter 90 contemplates that reports filed under section 90.010 are not subject to the same timing requirements that govern reports filed under section 90.003, the trial court did not abuse its discretion in considering this supplemental evidence.

The Emmites invoked section 90.010's safety-valve provision in response to Union Carbide's renewed request that the case be dismissed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 90.010(e)-(f). Citing the "extraordinary circumstances" provision of the asbestos statute, the Emmites proffered new expert reports into the record, including one from Dr. Prince, the board-certified pulmonologist who saw Emmite in the hospital before he died. *See id.* The Emmites also introduced an amended death certificate signed by Dr. McClure into the record, listing asbestosis as a cause of Emmite's death.

During a January 2008 hearing (the second hearing on the motion to reconsider), the MDL court noted that the Emmites had invoked section 90.010 and had requested an evidentiary hearing to determine whether their claim met Chapter 90's safety valve. *See id.* The MDL court granted the Emmites' motion for a full evidentiary hearing. *See id.* § 90.010(g). The court also granted Union Carbide's

request to depose Dr. McClure. In reply, the Emmites offered Dr. Prince's amended report into the record.

In November 2009, the MDL court held a third hearing on Union Carbide's motion to reconsider and ordered Union Carbide to file written objections to Dr. Prince's report. Union Carbide complied, while maintaining that the trial court should not consider Dr. Prince's amended report because it was not timely filed and did not meet the statutory criteria set forth in section 90.010. In December 2009, the trial court denied Union Carbide's renewed motion to dismiss by written order.

According to Union Carbide, the trial court had no discretion to consider any of the evidence—and in particular, Dr. Prince's final report—beyond Dr. Kradin's report and Dr. Britton's initial reports, because Dr. Prince's report was not served together with the Emmites' lawsuit. Proceedings under section 90.010's safety valve, it argues, are subject to the same filing and time constraints as those that govern section 90.003. The structure of the statute, however, suggests the opposite conclusion—that a trial court's decision under section 90.010 is not similarly time-constrained.

When construing a statute, we examine its plain meaning. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex.2006); *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex.2003). Our objective is to determine the legislature's intent. *Shumake*, 199 S.W.3d at 284. In discerning this intent, we may consider other matters, including the objective of the law, its legislative history, and the consequences of a particular construction. *See* TEX. GOV'T CODE ANN. § 311.023(1), (3), (5) (West 2005); *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex.1994). Applying these principles, we conclude that the trial

court was within its discretion to consider the medical reports before it.

First, Chapter 90 does not require the election that Union Carbide advances. Chapter 90 does not prohibit a claimant from invoking section 90.010 after foundering (or, in this case, prevailing) under section 90.003. If a claimant proceeds under the section 90.010 safety valve, the legislature made the case, expressly, an "except[ion]" to the mandatory dismissal rules contained in section 90.007. TEX. CIV. PRAC. & REM.CODE ANN. § 90.007(c) ("Except as provided by Section 90.010(d) or (e), if the court is of the opinion that a motion to dismiss is meritorious, the court shall ... grant the motion...."). Section 90.010(g) requires that the MDL court afford the parties a reasonable discovery period, and it must hold an evidentiary hearing to address the merit of the motion to dismiss. *Id.* § 90.010(g). The MDL court must make specific fact findings in support of its decision. *Id.* § 90.010(h). An MDL court's determination under section 90.010 thus is one beyond section 90.007's prima facie acceptance or rejection of the initial report filed at the outset of the lawsuit. Unlike section 90.003, section 90.010 expands the trial court's consideration of evidence well beyond the initial report—and is silent as to deadlines for this supplementation, leaving them to the MDL court.

Second, Dr. Prince's report was not served in response to Union Carbide's initial motion to dismiss. The Emmites had prevailed on that matter with a report that they had timely served. The Emmites filed supplemental expert reports, including Dr. Prince's report, and Union Carbide deposed Dr. McClure and Dr. Prince—all in connection with Union Carbide's renewed request that the trial court dismiss the case. Significantly, during that time, the Emmites elected to proceed under the safety valve, the part of the statute that

expressly allows for supplementation of the evidentiary record. Nothing in the statute prohibited the court from considering this evidence—including Dr. Prince's report—in response to Union Carbide's December 2009 renewed motion to dismiss. *See id.* § 90.010(g) (requiring reasonable discovery period and an evidentiary hearing). Section 90.010(g) does not impose a time frame—neither for obtaining discovery, nor for the completion of the hearing. Section 90.010(e) does not require that a report complying with subsection (f)(1) be served within the time frame required under section 90.006. *See id.* § 90.010(e). Concomitantly, section 90.006 requires only that section 90.003 and 90.004 reports (not section 90.010(f)(1) reports) be filed within thirty days after a defendant answers the lawsuit. TEX. CIV. PRAC. & REM. CODE ANN. § 90.006(a).

Union Carbide replies that, even if the statute does not contain timing requirements prohibiting the filing and consideration of Dr. Prince's report, the delay in this case is not reasonable, as it undermines the legislature's intent that Chapter 90 operate to weed out frivolous asbestos claims early in litigation. We agree that the legislature enacted Chapter 90 to weed out claimants who cannot show breathing impairment, and early consideration of dismissal is the contemplated norm for all but the rarest of asbestos cases. But the legislature enacted section 90.010 for the "exceptional and limited" case, one outside the norm. *See id.* § 90.010(j). It narrowly defined the parameters of such a case in detail. Section 90.010 does not impose a deadline for the length of time of discovery, nor for conducting an evidentiary hearing, nor for the ultimate ruling on the merit of the motion to dismiss. Section 90.006 does not impose its timing requirements for reports filed under 90.010, but rather only for those under section 90.003 and 90.004. Even if it did, the practical

effect on a meritorious section 90.010 report would be limited, because any dismissal under the statute is without prejudice to refiling the suit. *See id.* § 90.007(c). Under the procedure the legislature established in section 90.010, we hold that the trial court was not confined to the Emmites' original report (as amended) in considering Union Carbide's renewed request for dismissal, and could consider Dr. Prince's section 90.010(f)(1) amended report.

## II. Compliance With Requirements of Section 90.010

Union Carbide claims that the MDL court's findings lack an element of necessary support—a recent, as opposed to an out-of-date, pulmonary function test. The plurality agrees, decides that Dr. Prince's report is deficient under the statute, and declares the law unconstitutional for this reason.

### a. Standard of Review

Three principles encouraging our deference to the trial court's order are in play. First, in determining legislative intent, we accord statutes their plain and common meaning. *Shumake,* 199 S.W.3d at 284. Second, the legislature presumes that a court will interpret its enactments in a manner abiding with the constitution, if a constitutional interpretation reasonably can be afforded. *See* TEX. GOV'T CODE ANN. § 311.021 (West 2005). The overarching intent of the legislature, in passing any enactment, is that it comply with our state and federal constitutions. *See id.* ("In enacting a statute, it is presumed that . . . compliance with the constitutions of this state and the United States is intended . . . ."). Accordingly, "[w]e presume that a statute passed by the Legislature is constitutional." *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.,* 925 S.W.2d 659,

662 (Tex.1996). A court must not hold a legislative enactment to be unconstitutional unless it is absolutely necessary to so hold. *Texas State Bd. of Barber Exam'rs v. Beaumont Barber Coll., Inc.*, 454 S.W.2d 729, 732 (Tex.1970) (citing *Smith v. Patterson*, 111 Tex. 535, 538, 242 S.W. 749 (1922); *State v. Brownson*, 94 Tex. 436, 439, 61 S.W. 114 (1901); *Lytle v. Halff*, 75 Tex. 128, 132, 12 S.W. 610 (1889)). Thus, we construe statutes to avoid constitutional infirmities, if possible. *Nootsie*, 925 S.W.2d at 662.

Third, the trial court is the main arbiter of questions of proof, and section 90.010 expressly vests the trial court with reliability and credibility determinations. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.010(f)(2)(A) ("[T]he MDL pretrial court shall determine whether ... the report and medical opinions offered by the claimant are reliable and credible...."). We should reverse only if these determinations are an abuse of its discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex.2001) (trial court dismissal under former article 4591i, that required trial court to determine if an expert report was made in good faith based on whether it "appear[ed] to the court" that it did so, was reviewed for an abuse of discretion); *see also Curtis & Windham Architects, Inc. v. Williams*, 315 S.W.3d 102, 106 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (reviewing a trial court's decision to deny a motion to dismiss for failure to file a certificate of merit under an abuse of discretion standard); *Palladian Bldg. Co., Inc. v. Nortex Found. Designs, Inc.*, 165 S.W.3d 430, 433 (Tex. App.-Fort Worth 2005, no pet.) (reviewing trial court's dismissal in suit against professional for abuse of discretion and observing, "we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unrea-

sonable.") (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985)). With these principles in mind, we turn to whether the MDL court erred in concluding that Dr. Prince's report satisfied section 90.010(f)(1).

### b. Section 90.010(f)(1) Requirements

Chapter 90 provides a safety valve for asbestos claimants who, due to "extraordinary physical or medical characteristics," cannot meet its typical pulmonary-impairment proof requirements. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.010(f)(2)(B), (h)(1), (j). That safety valve still requires a physician's report with reliable indicia of trustworthiness. *See id.* § 90.010(f)(1)(A)-(B). But, with regard to pulmonary function testing, the safety-valve requirement is different: rather than requiring that pulmonary function testing reveal particular results, the safety-valve section requires only that pulmonary function testing "has been performed on the exposed person," and "the physician making the report has interpreted the pulmonary function testing." *Id.* § 90.010(f)(1)(B)(ii). The provision supposes that the MDL court may accept other medical proof as a reliable foundation for a physician's opinion—and that a treating doctor may reject the usefulness of pulmonary function testing. *See id.* § 90.010(f)(1), (g).

In this single instance—over years of handling the MDL asbestos docket—the MDL court found that the "extraordinary circumstances" section 90.010 allows this lawsuit to proceed, absent the typical pulmonary function results indicating breathing impairment. Dr. Prince opined that Emmite's debilitating illness rendered him unable to take a pulmonary function test when Dr. Prince examined him during a 2005 hospital visit. Emmite, however, had on occasion performed pulmonary testing—albeit historic and not recent, and

conducted by his employer. The Emmites provided these test results to Dr. Prince, who reviewed and interpreted the results. Compliance with the plain wording of the statute is undisputedly present. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.010(f)(1)(B)(ii); *see also City of San Antonio*, 111 S.W.3d at 25 (directing courts to first look to "plain and common meaning of statute's words" in cases involving statutory construction).

The plurality correctly observes that the historic test results, although a part of Emmite's medical history, played no role in Dr. Prince's diagnosis of pulmonary impairment. But the statute does not require that they do. A test must be performed, and it must be interpreted; but section 90.010 contains no provision that the testing be the basis for an impairment diagnosis. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.010(f)(1). Instead, section 90.010 lists other evidence that can support a treating physician's conclusion that the claimant has asbestos-related impairment "comparable to the impairment the exposed person would have had" if he could meet the pulmonary function testing requirements of the statute, like pathologic and radiographic results. *See id.* § 90.010(f)(1)(B)(iii), (iv). The statutory language vests the MDL court with discretion to make the determination whether the physician's report—a report that is not based on a pulmonary function test, but is comparable—is adequate. *See id.* § 90.010(f)(2).

The MDL trial court in this case made preliminary fact-findings after an evidentiary hearing. Among these: Emmite worked as an insulator for approximately thirty-nine years; some evidence exists that Emmite's death was in part caused by asbestos; Emmite suffered from physical and mental limitations, which made it impossible for him to take a pulmonary func-

tion test; and, had Emmite been capable of performing a pulmonary function test, the results would have demonstrated pulmonary impairment greater than that required under section 90.003 of the Texas Civil Practice and Remedies Code. The evidence that supports these impairment findings includes: (1) records of a diagnostic and therapeutic medical procedure—a thoracentesis—where doctors removed fluid from Emmite's lungs, revealing findings consistent with an exudative pleural effusion and asbestosis, (2) an autopsy report, (3) Joseph Emmite's medical records and occupational history, and (4) a chest CT scan revealing extensive pleural and diaphragmatic calcifications, a right pleural effusion, and bilateral interstitial fibrotic patterns. Union Carbide has not challenged the sufficiency of the evidence supporting the court's factual findings. Nor did Union Carbide proffer an expert to controvert Dr. Prince's conclusion that Joseph Emmite suffered asbestos-related impairment during his lifetime. We should defer to the evidentiary findings of the MDL pre-trial court, because they are reasonable and supported by the evidence. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex.2002) (trial court does not abuse its discretion if some evidence of substantive and probative character supports the trial court's decision). The MDL judge also found that, had Emmite performed a recent pulmonary function test, the test would have "demonstrated pulmonary impairment greater than required under Texas Civil Practice and Remedies Code § 90.003." Union Carbide does not challenge that finding.

In concluding that Dr. Prince's report satisfies the requirements of section 90.010(f)(1)(B)(ii), we do not read section 90.010(f) in a vacuum. Section 90.010(f)—which applies to MDL proceedings only and grants an MDL judge the discretion to accept substitute proof for extraordinary

reasons—contains safeguards to eliminate unmeritorious claims for asbestos-related impairment. These safeguards differ from those contained in section 90.003. Nevertheless, they erect barriers to limit the application of section 90.010 to extraordinary cases. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.010(j) ("Subsections ... (e)-(i) ... apply only in exceptional and limited circumstances in which the exposed person does not satisfy the medical criteria of Section 90.003 or 90.004 but can demonstrate meaningful asbestos-related ... physical impairment that satisfies the requirements of subsection (f)."). An expert report filed in accord with section 90.010(f)(1) must meet the following requirements: (1) the expert report must satisfy selected statutory criteria contained in section 90.003,[1] (2) the expert making the report must have a physician-patient relationship with the exposed person, (3) the expert must conclude that radiographic, pathological, or CT evidence establishes bilateral pleural disease, and (4) the physician must conclude that the impairment is sufficiently serious to be comparable to the statutory criteria for impairment set forth in section 90.003(a)(2)(D). TEX. CIV. PRAC. & REM.CODE ANN. § 90.010(f)(1)(A)-(B). After conducting an evidentiary hearing, the MDL judge—who is appointed by the Chief Justice of the Texas Supreme Court and who routinely hears issues regarding asbestos cases—must make written fact findings. *Id.* § 90.010(f)(2), (h)(1)-(2). Among these, the MDL judge must find that: (1) the treating physician's report is "reliable and credible," (2) the claimant's "unique or extraordinary physical or medical characteristics" render the statutory medical criteria set forth in section 90.003 inadequate to assess the claimant's physical impairment, and (3) the claimant's physical impairment is comparable to the statutory medical criteria for impairment under 90.003. *Id.*

Union Carbide contends that Dr. Prince's report does not satisfy a different safeguard—the pulmonary testing requirement. *See id.* § 90.010(f)(1)(B)(ii). In so doing, Union Carbide asks the Court to adopt a statutory construction that any pulmonary function testing must meet three criteria for test results to pass statutory muster, even under the safety valve: (1) a measurement level that is above normal but below the statutory medical criteria and thus demonstrates some impairment, (2) a recency requirement, and (3) reliance by the treating physician on the results for his diagnosis. Union Carbide contends that, because the pulmonary function testing the Emmites proffered reveals normal results, was not in connection with hospitalizations before Emmite's death, and Dr. Prince did not use the test to diagnose Emmite, the suit must be dismissed. The plurality adopts this statutory construction, concluding that Dr. Prince's report is defective, thus rendering the statute an unconstitutional, ex post facto law, is its view.

---

1. Section 90.010(f)(1)(A) requires that a report meet criteria set forth in section 90.003. Tex. Civ. Prac. & Rem.Code Ann. § 90.010(f)(1)(A). The report must be completed by a physician who is board certified in pulmonary medicine, internal medicine, or occupational medicine. *Id.* § 90.003(a)(2). It must verify that the physician (1) performed a physical examination of the person or reviewed available medical records, (2) took a detailed occupational history from the exposed person or, if the claimant is deceased, from a person knowledgeable about the alleged exposure, (3) took a detailed medical and smoking history, including other medical problems and their probable causes. *Id.* § 90.003(a)(2)(A). The report must also (1) verify that at least ten years have elapsed between the exposure to asbestos and the date of the diagnosis, (2) rule out other causes of the impairment, and (3) attach pertinent test results. *Id.* § 90.003(a)(2)(B), (E), (F).

We disagree with such a construction. First, the legislature did not create the impairment measurement criteria that Union Carbide seeks to advance. Rather, the legislature created one definition for impairment reflected in pulmonary tests for section 90.003 cases, and expressly granted discretion to the MDL court to consider other test results when pulmonary function test results do not satisfy the 90.003 medical criteria—the statute even lists sources of alternative medical proof. *Compare* TEX. CIV. PRAC. & REM.CODE ANN. § 90.003 (listing pulmonary function test requirements for expert report in asbestos-related impairment cases), *with* TEX. CIV. PRAC. & REM.CODE ANN. § 90.010 (granting MDL trial court discretion to consider expert report that *does not satisfy medical criteria* of section 90.003, provided report meets alternative requirements and demonstrates meaningful impairment). A claimant invokes the safety-valve provision only when he cannot satisfy the statutorily-required medical criteria for pulmonary function testing under section 90.003.[2] *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.010(e), (j). The very existence of the safety-valve provision suggests that the legislature intended to allow a treating physician (and, ultimately, the MDL judge) to reject useless pulmonary function test results when other strong medical evidence supports a finding of impairment. The relevance of these test results cannot be determined by measurement levels alone.

Second, Union Carbide suggests that the claimant's tests are not relevant because they are decades old. But test results that are part of a patient's medical history may be relevant even though they are old. For example, old pulmonary function test re-

sults may help determine the onset of impairment. And normal test results may indicate no breathing impairment caused by exposure at the time. Either circumstance may cause the MDL trial judge to question the credibility and reliability of a physician's report who disregards their diagnostic value. In such a case, the MDL judge could, in the exercise of his discretion, deny the plaintiff from bringing a suit under the safety valve provision.

Finally, Union Carbide claims that the treating physician must rely on pulmonary function test results in reaching his diagnosis. Dr. Prince admits that he did not rely on the old pulmonary function test results in reaching his impairment opinion, states that Emmite was physically incapable of performing such a test at the time he saw him in the hospital, and that a pulmonary function test would have shown impairment if Emmite could have completed one. Union Carbide's argument is premised on its assertion that the pulmonary function testing requirement is meaningless without a doctor's reliance on the test results—results that the safety-valve provision contemplates are infirm under section 90.003. We disagree. The legislature reasonably adopted criteria to allow the MDL judge discretion to weigh all the medical evidence in cases by claimants with "unique or extraordinary physical or medical characteristics." TEX. CIV. PRAC. & REM.CODE ANN. § 90.010(f)(2)(B), (C) (requiring trial judge to find that, due to extraordinary circumstances, medical criteria in section 90.003 do not address claimant's impairment, but requiring sufficient credible evidence to allow fact finder to conclude that claimant suffered impairment comparable to standards set forth in section 90.003). Section 90.010(f)(1)(B)(ii)

---

**2.** If the minimum statutory criteria can be satisfied, the other criteria set forth in section

90.003(a)(2) presumably will also be satisfied.

contains no directive requiring proof that the treating physician rely on the pulmonary function test results to conclude that a claimant is impaired from asbestos exposure. To the contrary, under that section, a claimant seeks to prove impairment based on other medical evidence—for the very reason that the pulmonary function test is unreliable. It was those sorts of instances that the safety valve was intended to address. If a statutory reading requiring reliance on these results springs constitutional doubt, and another reasonable interpretation exists, then it is not the interpretation that the legislature intended. *See* TEX. GOV'T CODE ANN. § 311.021. We will not read language into the statute that the legislature did not include. *See Iliff v. Iliff,* 339 S.W.3d 74, 80–81 (Tex. 2011); *see also Lee v. City of Houston,* 807 S.W.2d 290, 294–95 (Tex.1991) (observing that courts may not judicially amend statute to add words not implicitly contained in statute); *Duncan, Wyatt & Co. v. Taylor,* 63 Tex. 645, 649 (1885) (declaring that courts may not add statutory conditions or provisions not included by legislature). We conclude that the report meets the statutory criteria: the claimant tendered pulmonary function test results to his treating physician, and the physician verified that he reviewed and interpreted the testing. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.010(f)(1)(B)(ii).

### Conclusion

Chapter 90 prevents meritless or premature asbestosis claims from clogging the court system. The MDL court found this suit to be neither premature nor wholly meritless. The plurality rejects the MDL court's findings and a constitutional reading of the statute in favor of an expansive interpretation, requiring that pulmonary function testing be of a particular kind at a certain date. Just such an interpretation, it holds, renders the statute an unconstitutional ex post facto law. Whether a new proof requirement in a nascent wrongful death case is an ex post facto law under the constitution is one question. But the MDL court found that the statute's proof requirement was met. The MDL court's decision holds sway and should be evaluated in light of a constitutional reading of the statute, because one can be had. We conclude that the trial court did not abuse its discretion in refusing to dismiss the case, because sufficient evidence supports its findings under section 90.010.

EVELYN V. KEYES, Justice, dissenting.

I respectfully dissent from this Court's en banc judgment affirming the trial court's order denying Union Carbide Corporation's ("Union Carbide") motion to dismiss [1] the claims of Daisy E. Synatzske and Grace Annette Webb, individually and as representatives and co-executrixes of the estate of Joseph Emmite, Sr., Joseph Emmite, Jr., Dorothy Day, Vera J. Gialmalva, and James R. Emmite (collectively, "the Emmites"), in the Emmites' wrongful-death suit against Union Carbide for the death of Joseph Emmite, Sr. ("Joseph").

I join parts I, II, III, and IV of the En Banc Opinion. I agree with the plurality's construction of Civil Practice and Remedies Code Chapter 90, set out in part IV of the plurality opinion, and I disagree with the concurring justices' construction of Chapter 90. However, I disagree with the plurality's conclusion that Chapter 90 is unconstitutional as applied to the Emmites' claims in this case. I believe that the statute is constitutional as applied here and that it worked in this case exactly as the Texas Legislature intended it to work:

1. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.007 (Vernon 2011).

to bar a suit for damages for wrongful death brought by the heirs of an asbestos worker who remained functionally and physically unimpaired from undiagnosed asbestosis until his death at the age of eighty-five.

Thus, I agree with the plurality's holding that the trial court erred in finding that the Emmites satisfied Civil Practice and Remedies Code section 90.010[2] through the provision of Dr. Prince's reports. This is because, as stated in the plurality opinion, I conclude that section 90.010(f)—which the parties refer to as the "safety valve"—may only be reasonably interpreted as requiring a plaintiff claiming non-cancerous asbestos-related impairment to substantiate his claim of impairment with pulmonary function testing that is relevant to his diagnosis. I, therefore, disagree with the concurring opinion, which reads each subparagraph of section 90.010(f) separately and finds its requirements satisfied by a pulmonary function test that was performed forty years before Joseph's death from "possible asbestosis" and that showed no impairment at that time.

When the statute is read as a whole, it is obvious to me that a plaintiff cannot meet any of the statutory reporting requirements of section 90.010, including the relaxed requirements under the safety-valve provision, by providing "historic" results from a test that was performed forty years prior to any allegation of impairment and an accompanying diagnosis. Simply put, when the results of "historic" or "ancient" pulmonary function testing submitted by a plaintiff are completely and indisputably irrelevant to the impairment for which a plaintiff is seeking recovery, a plaintiff has not satisfied the safety-valve provision.

However, I cannot join the plurality's holding that, because section 90.010(f) requires a plaintiff to undergo pulmonary function testing that is relevant to a diagnosis of impairment and Joseph was too weak to take such a test a month before his death, section 90.010(f) is unconstitutional as applied to bar the Emmites' wrongful-death claims retroactively. Rather, I would hold that, properly applied, the statute would function under the circumstances presented by this case exactly as the legislature intended: namely, to bar claims against limited asbestosis funds by the heirs of an asbestos worker who suffered no functional or physical disability during his lifetime due to a diagnosed pulmonary disease shown by a pulmonary function test and other evidence to be asbestos-related. I believe, in accord with recent, controlling precedent from the Texas Supreme Court, that the legislature enacted Chapter 90 to serve the "compelling public interest" of protecting limited funds available to compensate the victims of asbestos-related diseases, as evidenced by its detailed findings, and that this compelling public interest, under the circumstances presented in this case, overcomes "the heavy presumption against retroactive laws." *See Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 146 (Tex.2010). Therefore, I would hold that section 90.010(f) is constitutional as applied in this case.

## A. Safety–Valve

Although I agree with and fully join the reasoning set forth by the plurality concerning its interpretation of the pulmonary function testing requirement in the safety-valve provision, I write separately to emphasize one point with respect to the requirements of Chapter 90.

---

2. *See id.* § 90.010 (Vernon 2011).

Section 90.003 prescribes the filing of a report when a claimant asserts an asbestos-related injury, and it requires, among other things, a report by a physician that "verifies that the exposed person has asbestos-related pulmonary impairment as demonstrated by pulmonary function testing" that shows certain objective measurements. TEX. CIV. PRAC. & REM.CODE ANN. § 90.003(a)(2)(D) (Vernon 2011). Section 90.010, the safety-valve provision, prescribes an alternative method to satisfy Chapter 90's report requirement for a claimant asserting an asbestos-related injury. *Id.* § 90.010(f)(1) (Vernon 2011). Although the safety-valve provision omits some of the specific objective measurements that must be shown in a report pursuant to section 90.003,[3] it still requires many of the same things required by section 90.003, including the performance of a relevant pulmonary function test. *See id.* § 90.010(f)(1)(B)(ii). Specifically, even the less-stringent safety-valve provision requires a report by a physician verifying that:

(i) the physician making the report has a physician-patient relationship with the exposed person;

(ii) *pulmonary function testing has been performed on the exposed person and the physician making the report has interpreted the pulmonary function testing;*

(iii) the physician making the report has concluded, to a reasonable degree of medical probability, that the exposed person has radiographic, pathologic, or computed tomography evidence establishing bilateral

pleural disease or bilateral parenchymal disease caused by exposure to asbestos ...; and

(iv) the physician has concluded that the exposed person has asbestos-related ... physical impairment comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003 or 90.004[.]

*Id.* § 90.010(f)(1)(B) (emphasis added).

When the statute is considered as a whole, it is clear that, although the legislature relaxed a number of objective measurements required in a section 90.003 report, the legislature retained in the safety-valve provision the requirement that pulmonary function testing be performed on the plaintiff claiming impairment and, necessarily, that such testing be relevant to the impairment diagnosis. Although our concurring colleagues state that "[p]ro forma compliance with the statute is undisputedly present," this proposition is certainly disputed by Union Carbide, as well as by the original panel. I agree with the original panel. In my view, allowing a plaintiff to satisfy the safety-valve's pulmonary function testing requirement by referring to testing results obtained over forty years before the plaintiff made any claim of an asbestos-related impairment disregards the plain language of the statute and frustrates the unmistakable purpose of Chapter 90, to which I now turn. *See id.* § 90.010(f)(1)(B)(ii) (requiring physician to perform pulmonary function testing on exposed person).

**B. Constitutionality**

3. For example, under section 90.003, the report must verify that the exposed person has asbestos-related pulmonary impairment as demonstrated by pulmonary function testing and the testing must show "forced vital capacity below the lower limit of normal or below 80 percent of predicted and FEV1/FVC ratio (using actual values) at or above the lower limit of normal or at or above 65 percent" or "total lung capacity, by plethysmography or timed gas dilution, below the lower limit of normal or below 80 percent of predicted[.]" *Id.* § 90.003(a)(2)(D) (Vernon 2011).

While I agree with the plurality that section 90.010(f) was applied retroactively in this case, I specifically disagree with the plurality's reasoning and conclusion with respect to the constitutionality of section 90.010(f) as applied because I believe this case fully satisfies the criteria for finding retroactive applications of the law to be constitutional as set out in the Texas Supreme Court's recent opinion in *Robinson.* *See* 335 S.W.3d at 147–50 (holding that Civil Practice and Remedies Code Chapter 149, limiting certain corporation's successor liability for personal injury claims based on asbestos exposure, violated prohibition against retroactive laws contained in Texas Constitution article I, section 16 when applied to bar suit by worker diagnosed with mesothelioma seeking to recover for damages caused by exposure to asbestos).

In *Robinson,* the supreme court, after reviewing its prior vested rights jurisprudence, stated,

> We think our cases establish that the constitutional prohibition against retroactive laws does not insulate every vested right from impairment, nor does it give way to every reasonable exercise of the Legislature's police power; it protects settled expectations that rules are to govern the play and not simply the score, and prevents the abuses of legislative power that arise when individuals or groups are singled out for special reward or punishment. No bright-line test for unconstitutional retroactivity is possible. Rather, in determining whether a statute violates the prohibition against retroactive laws in article I, section 16 of the Texas Constitution, *courts must consider three factors in light of the prohibition's dual objectives: the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; the nature of the prior right impaired by the*

*statute; and the extent of the impairment.* The perceived public advantage of a retroactive law is not simply to be balanced against its relatively small impact on private interests, or the prohibition would be deprived of most of its force. There must be a compelling public interest to overcome the heavy presumption against retroactive laws. To be sure, courts must be mindful that statutes are not to be set aside lightly. This Court has invalidated statutes as prohibitively retroactive in only three cases, all involving extensions of statutes of limitations. But courts must also be careful to enforce the constitutional prohibition to safeguard its objectives.

*Id.* at 145–46 (citations omitted) (emphasis added). The court emphasized that, under the above test, "changes in the law that merely affect remedies or procedure, or that otherwise have little impact on prior rights, are usually not unconstitutionally retroactive." *Id.* at 146.

In this case, with respect to the first *Robinson* factor—the nature and strength of the public interest served by the statute—the legislature's statement of purpose and factual findings make it clear that the legislature enacted Chapter 90 specifically in response to an "asbestos litigation crisis," which it found to be "costly to employers, employees, litigants, and the court system." Act of May 16, 2005, 79th Leg., R.S., ch. 97, § 1(f)-(g), 2005 Tex. Gen. Laws 169, 169. The legislature cited the fact that "hundreds of thousands of lawsuits alleging asbestos-related disease have been filed throughout the United States" and that "[i]n the period from 1988 to 2000, more lawsuits alleging asbestos-related disease were filed in Texas than in any other state." *Id.* § 1(c)-(d). The legislature also noted that "[t]housands of asbestos lawsuits are pending in Texas courts today," and it contended that the

"crush of asbestos litigation has been costly to employers, employees, litigants, and the court system." *Id.* § 1(e)-(f). The legislature found that "more than 70" companies had declared bankruptcy "due to the burden of asbestos litigation," and the legislature cited estimates that "between 60,000 and 128,000 American workers" had "lost their jobs as a result of asbestos-related bankruptcies and that eventually 423,000 jobs" would "be lost due to asbestos-related bankruptcies." *Id.* § 1(g).

The legislature stated that it enacted Chapter 90 not only to protect companies that are commonly sued for asbestos-related injuries and their employees, but also to protect "the right of people with impairing asbestos-related ... injuries to pursue their claims for compensation in a fair and efficient manner through the Texas court system, while at the same time *preventing scarce judicial and litigant resources from being misdirected by the claims of individuals who have been exposed to asbestos ... but have no functional or physical impairment from asbestos-related ... disease.*" *Id.* § 1(n), 2005 Tex. Gen. Laws at 170 (emphasis added). The legislature found that persons who were not "functionally or physically impaired by any asbestos-related illness" and who had brought asbestos-related lawsuits had "severely hamper[ed] the ability of seriously ill claimants to seek redress in the courts." *Id.* § 1(h), 2005 Tex. Gen. Laws at 169. The court stated that "[t]hose claimants who have had their day in court often find that the value of their recovery is seriously reduced when the company against whom the judgment was rendered files bankruptcy due to the weight of asbestos litigation brought by unimpaired claimants." *Id.*, 2005 Tex. Gen. Laws 169–70. Thus, in contrast to Chapter 149, the Texas Legislature made clear its intent in enacting Chapter 90 through extensive legislative findings. Significantly, the supreme court in *Robinson* acknowledged the legislative findings made in support of Chapter 90 in distinguishing Chapter 90 from Chapter 149, at issue in *Robinson.* *See* 335 S.W.3d at 149 ("The Legislature has recognized the severity of [the asbestos litigation] crisis in another context [Chapter 90], but it did not do so in enacting House Bill 4 and Chapter 149.").

Thus, I would conclude that, as evidenced by the Texas Legislature's findings, the legislature enacted Chapter 90 to serve a "compelling public interest" that overcomes "the heavy presumption against retroactive laws." *Id.* at 146. Consideration of the remaining Robinson factors—the nature of the prior right impaired by the statute and the extent of the impairment—does not alter my conclusion that the Emmites' prior right to sue Union Carbide for damages for Joseph's wrongful death was not insulated from impairment by the constitutional prohibition against retroactive laws and that the legislature's exercise of its police power to bar recovery by heirs of a decedent for wrongful death in a case such as this was reasonable. *See id.* at 145–46.

Chapter 90 became effective on September 1, 2005, three months after Joseph's death but over one year before the Emmites filed suit. Accordingly, the Emmites were required to file a complying report once they filed their wrongful-death lawsuit. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.006 (Vernon 2011) (requiring, in action filed after effective date of Chapter 90, claimant to serve report complying with section 90.003 not later than 30th day after defendant answers or enters appearance). It is undisputed that, during the last month of his life, Joseph could not undergo pulmonary function testing and that Joseph was deceased at the time that

Chapter 90 became effective.[4] It is also undisputed that, prior to the enactment of Chapter 90, and at the time of Joseph's death, the Emmites would not have been required to file a report including pulmonary function testing results to pursue their wrongful-death claims. Thus, I recognize that the enactment of Chapter 90 impaired the Emmites' right to pursue their wrongful-death claims.

However, many of the factors considered by the supreme court in *Robinson* in regard to the nature of the claimants' rights are not present in the instant case. For example, in *Robinson*, the supreme court specifically noted that the legislature had enacted Chapter 149 with the specific intent to extinguish pending claims against a single defendant. *See* 335 S.W.3d at 148. The court also noted that, at the time the legislature enacted Chapter 149, the Robinsons had already filed suit. *See id.* at 130. Thus, in *Robinson*, Chapter 149 operated to strip litigants of their right to pursue "mature" claims that were already filed and pending. *See id.* at 148. The court also characterized the Robinsons' recovery as "more predictable," emphasizing that the injury at issue was "mesothelioma," such an injury was a "uniquely asbestos-related disease," and the record evidence reflected that the "claims had a substantial basis in fact." *Id.*

Here, although it is not a dispositive consideration, the Emmites' claims were not yet pending on the date that Chapter 90's reporting requirements became effective. *See Satterfield v. Crown Cork & Seal Co.*, 268 S.W.3d 190, 207–08 (Tex.App.-Austin 2008, no pet.) ("[T]he Legislature may not retroactively extinguish or elimi-

nate accrued *and pending* causes of action, either by procedural changes such as shortening statutes of limitation, or by substantive changes, such as creating new affirmative defenses") (emphasis added).

More significantly, the Emmites' wrongful-death claims are based on statute rather than common law. *See Robinson*, 335 S.W.3d at 135 (recognizing that "an analysis of the retroactive effect" of particular statute "on common law claims and statutory claims presents different considerations"). And, under the facts of this case, the wrongful death statute upon which the Emmites rely is invoked here to provide *only* for recovery by the heirs of a deceased asbestos worker who showed no functional or physical impairment even colorably due to asbestosis while showing significant impairment due to the disabilities of old age; who had no shortened life span as a provider for his family due to asbestosis; and who had no medical bills attributable to asbestosis at the time of his death, in direct contravention of the purpose of the statute as stated by the Texas Legislature in its findings. Specifically, Chapter 90 was enacted to protect persons "with impairing asbestos-related ... injuries" by "preventing scarce judicial and litigant resources from being misdirected by the claims of individuals who ... have no functional or physical impairment from asbestos-related disease." Act of May 16, 2005, § 1(n), 2005 Tex. Gen. Laws at 170. Thus, I am compelled to conclude that this suit falls into the category of those lawsuits that "severely hamper[ ] the ability of seriously ill claimants to seek redress in the courts." *Id.* § 1(h), 2005 Tex. Gen. Laws at 169. In my mind, therefore, allowing this suit to proceed undermines the precise

---

4. *In its briefing, Union Carbide "does not dispute that [Joseph] had a diagnosis of asbestosis; ... and that, given his advanced dementia" and other conditions, "pulmonary function testing during [Joseph's] last few* months of life was likely unobtainable." The record before us also establishes that at the time Joseph died, breathing tests were not required to bring claims like those asserted by the Emmites.

compelling state purpose for which Chapter 90 was enacted.

I also note that, in contrast with the record evidence in this case, the claimant in *Robinson* suffered from mesothelioma, a fatal disease invariably associated with exposure to asbestos, while Joseph suffered from multiple infirmities attributable to his advanced age, his history of smoking, and other causes, as well as "possible asbestosis," diagnosed only a month before his death. He had never been treated for any pulmonary disease that called into question his past work with asbestos or indicated the need for a pulmonary function test, nor is there any indication that he was functionally or physically impaired by asbestos-related disease until, at the earliest, one month before his death at age eighty-five. Thus, although asbestosis is an asbestos-related impairment, I do not share the plurality's view that the record before us demonstrates that the Emmites' claims have a substantial basis in fact. Rather, I believe that the record raises legitimate questions as to whether the Emmites, if allowed to proceed with their claims, would ultimately prevail. At a minimum, I think that, unlike the record considered by the supreme court in *Robinson*, the record before us does not demonstrate that the Emmites' wrongful-death claims have "a substantial basis in fact" for which their ultimate recovery is "predictable." *See* 335 S.W.3d at 148.

Finally, I believe that the reporting requirements imposed by Chapter 90 can be fairly characterized as a change in law that "merely affect[s] remedies or procedure," namely the right of heirs of an asbestos worker to recover damages for the functional or physical impairment of the deceased, rather than substantive vested rights. *Id.* at 146. In sum, I do not think that section 90.010(f)'s requirements that persons claiming functional or physical impairment due to an asbestos-related disease be required to show (1) that "pulmonary function testing has been performed on the exposed person," (2) that the testing has been interpreted by the physician making the report, (3) that the physician has concluded the exposed person has "bilateral pleural disease or bilateral parenchymal disease caused by exposure to asbestos," and (4) that the physician making the report has "concluded that the exposed person has asbestos-related ... physical impairment comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003" place an unconstitutional hurdle on claimants seeking asbestos funds simply because the law is applied retroactively to bar the damage claims of heirs of a claimant who showed no functional or physical impairment ascribable to asbestosis until immediately prior to his death, who had no medical bills more than colorably due to asbestosis, and whose ability to provide for his family was not hindered by a shortened lifespan or by lingering disease due to asbestos exposure. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 90.010(f). Nor do I think the application of section 90.010(f) in this case to bar the Emmites' wrongful death suit "disturbs settled expectations" in the same way that the application of Chapter 149 extinguished any and all pending claims against a single corporate defendant in *Robinson*, including those of the plaintiff, an asbestos worker suffering from mesothelioma who had filed suit prior to the enactment of the law. *See Robinson*, 335 S.W.3d at 148–49. In my view, at the time of Joseph Emmite's death, his family had no reasonable expectation of recovering damages under Chapter 90, as he had not been diagnosed with asbestosis at any time during his long life prior to his diagnosis of "possible asbestosis" one month before his death and he suffered many of the infirmities of old age.

I would hold that Chapter 90, as applied to the Emmites' claims, does not violate article 1, section 16 of the Texas Constitution. Accordingly, I would overrule the constitutional challenge raised by the Emmites in their appellees' brief and reverse the order of the trial court.